*587 Chief Justice Roberts
delivered the opinion of the Court, except as to Parts II-B and III-B.†
Federal immigration law expressly preempts “any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ . . . unauthorized aliens.” 8 U. S. C. § 1324a(h)(2). A recently enacted Arizona statute — the Legal Arizona Workers Act — provides that the licenses of state employers that knowingly or intentionally employ unauthorized aliens may be, and in certain circumstances must be, suspended or revoked. The law also requires that all Arizona employers use a federal electronic verification system to confirm that the workers they employ are legally authorized workers. The question presented is whether federal immigration law preempts those provisions of Arizona law. Because we conclude that the State’s licensing provisions fall squarely within the federal statute’s saving clause and that the Arizona regulation does not otherwise conflict with federal law, we hold that the Arizona law is not preempted.
I
A
In 1952, Congress enacted the Immigration and Nationality Act (INA), 66 Stat. 163, as amended, 8 U.S.C. §1101 et seq. That statute established a “comprehensive federal statutory scheme for regulation of immigration and naturalization” and set “the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.” De Canas v. Bica, 424 U. S. 351, 353, 359 (1976).
In the years following the enactment of the INA, several States took action to prohibit the employment of individuals *588 living within state borders who were not lawful residents of the United States. For example, in 1971 California passed a law providing that “[n]o employer shall knowingly employ an alien who is not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers.” 1971 Cal. Stats, ch. 1442, § 1(a). The California law imposed fines ranging from $200 to $500 for each violation of this prohibition. §l(b). At least 11 other States enacted provisions during that same time period proscribing the employment of unauthorized aliens.[1]
We first addressed the interaction of federal immigration law and state laws dealing with the employment of unauthorized aliens in De Canas, 424 U. S. 351. In that case, we recognized that the “[p]ower to regulate immigration is unquestionably ... a federal power.” Id., at 354. At the same time, however, we noted that the “States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State,” id., at 356, that “prohibiting] the knowing employment ... of persons not entitled to lawful residence in the United States, let alone to work here, is certainly within the mainstream of [the State’s] police power,” ibid., and that the Federal Government had “at best” expressed “a peripheral concern with [the] employment of illegal entrants” at that point in time, id., at 360. As a result, we declined to hold that a state law assessing civil fines for the employment of unauthorized aliens was preempted by federal immigration law.
Ten years after De Canas, Congress enacted the Immigration Reform and Control Act (IRCA), 100 Stat. 3359. IRCA makes it “unlawful for a person or other entity ... to hire, *589 or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien.” 8 U. S. G. § 1324a(a)(l)(A). IRCA defines an “unauthorized alien” as an alien who is not “lawfully admitted for permanent residence” or not otherwise authorized by the Attorney General to be employed in the United States. § 1324a(h)(3).
To facilitate compliance with this prohibition, IRCA requires that employers review documents establishing an employee’s eligibility for employment. §1324a(b). An employer can confirm an employee’s authorization to work by reviewing the employee’s United States passport, resident alien card, alien registration card, or other document approved by the Attorney General; or by reviewing a combination of other documents such as a driver’s license and social security card. §§ 1324a(b)(l)(B)-(D). The employer must attest under penalty of perjury on Department of Homeland Security Form 1-9 that he “has verified that the individual is not an unauthorized alien” by reviewing these documents. § 1324a(b)(l)(A). The form 1-9 itself “and any information contained in or appended to [it] . . . may not be used for purposes other than for enforcement of” IRCA and other specified provisions of federal law. § 1324a(b)(5).
Employers that violate IRCA’s strictures may be subjected to both civil and criminal sanctions. Immigration and Customs Enforcement, an entity within the Department of Homeland Security, is authorized to bring charges against a noneompliant employer under § 1324a(e). Depending on the circumstances of the violation, a civil fine ranging from $250 to $16,000 per unauthorized worker may be imposed. See § 1324a(e)(4)(A); 73 Fed. Reg. 10136 (2008). Employers that engage in a pattern or practice of violating IRCA’s requirements can be criminally prosecuted, fined, and imprisoned for up to six months. § 1324a(f)(l). The Act also imposes fines for engaging in “unfair immigration-related employment practice^] ” such as discriminating on the basis of citizenship or national origin. § 1324b(a)(l); see §'1324b(g)(2)(B). *590 Good-faith compliance with IRCA’s 1-9 document review requirements provides an employer with an affirmative defense if charged with a § 1324a violation. § 1324a(a)(3).
IRCA also restricts the ability of States to combat employment of unauthorized workers. The Act expressly preempts “any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens.” § 1324a(h)(2). Under that provision, state laws imposing civil fines for the employment of unauthorized workers like the one we upheld in De Canas are now expressly preempted.
In 1996, in an attempt to improve IRCA’s employment verification system, Congress created three experimental complements to the 1-9 process as part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), 110 Stat. 3009-655, note following 8 U. S. C. § 1324a. Arizona Contractors Assn., Inc. v. Candelaria, 534 F. Supp. 2d 1036, 1042 (Ariz. 2008); see 8 U. S. C. § 1324a(d). Only one of those programs — E-Verify—remains in operation today. Originally known as the “Basic Pilot Program,” E-Verify “is an internet-based system that allows an employer to verify an employee’s work-authorization status.” Chicanos Por La Causa, Inc. v. Napolitano, 558 F. 3d 856, 862 (CA9 2009). An employer submits a request to the E-Verify system based on information that the employee provides similar to that used in the 1-9 process. In response to that request, the employer receives either a confirmation or a tentative non-confirmation of the employee’s authorization to work. An employee may challenge a noneonfirmation report. If the employee does not do so, or if his challenge is unsuccessful, his employment must be terminated or the Federal Government must be informed. See ibid.
In the absence of a prior violation of certain federal laws, IIRIRA prohibits the Secretary of Homeland Security from “requiring] any person or . . . entity” outside the Federal *591 Government “to participate in” the E-Verify program, §§ 402(a), (e), 110 Stat. 3009-656 to 3009-658. To promote use of the program, however, the statute provides that any employer that utilizes E-Verify “and obtains confirmation of identity and employment eligibility in compliance with the terms and conditions of the program . . . has established a rebuttable presumption” that it has not violated IRCA’s unauthorized alien employment prohibition, § 402(b)(1), id., at 3009-656 to 3009-657.
B
Acting against this statutory and historical background, several States have recently enacted laws attempting to impose sanctions for the employment of unauthorized aliens through, among other things, “licensing and similar laws,” 8 U. S. C. § 1324a(h)(2).[2] Arizona is one of them. The Legal Arizona Workers Act of 2007 allows Arizona courts to suspend or revoke the licenses necessary to do business in the State if an employer knowingly or intentionally employs an unauthorized alien. Ariz. Rev. Stat. Ann. §§23-211,23-212, 23-212.01 (West Supp. 2010) (citing 8 U. S. C. § 1324a).
Under the Arizona law, if an individual files a complaint alleging that an employer has hired an unauthorized alien, the attorney general or the county attorney first verifies the employee’s work authorization with the Federal Government pursuant to 8 U. S. C. § 1373(c). Ariz. Rev. Stat. Ann. §23-212(B). Section 1373(c) provides that the Federal Government “shall respond to an inquiry by a” State “seeking to verify or ascertain the citizenship or immigration status of any individual ... by providing the requested verification or status information.” The Arizona law expressly prohib *592 its state, county, or local officials from attempting “to independently make a final determination on whether an alien is authorized to work in the United States.” Ariz. Rev. Stat. Ann. § 23-212(B). If the § 1373(c) inquiry reveals that a worker is an unauthorized alien, the attorney general or the county attorney must notify United States Immigration and Customs Enforcement officials, notify local law enforcement, and bring an action against the employer. §§ 23-212(C)(l)-(3), (D).
When a complaint is brought against an employer under Arizona law, “the court shall consider only the federal government’s determination pursuant to” 8 U. S. C. § 1373(c) in “determining whether an employee is an unauthorized alien.” §23-212(H). Good-faith compliance with the federal 1-9 process provides employers prosecuted by the State with an affirmative defense. § 23-212(J).
A first instance of “knowingly employing] an unauthorized alien” requires that the court order the employer to terminate the employment of all unauthorized aliens and file quarterly reports on all new hires for a probationary period of three years. §§23-212(A), (F)(l)(a)-(b). The court may also “order the appropriate agencies to suspend all licenses ... that are held by the employer for [a period] not to exceed ten business days.” § 23~212(F)(l)(d). A second knowing violation requires that the adjudicating court “permanently revoke all licenses that are held by the employer specific to the business location where the unauthorized alien performed work.” § 23-212(F)(2).
For a first intentional violation, the court must order the employer to terminate the employment of all unauthorized aliens and file quarterly reports on all new hires for a probationary period of five years. §§23-212.01(A), (F)(l)(a)-(b). The court must also suspend all the employer’s licenses for a minimum of 10 days. § 23-212.01(F)(l)(c). A second intentional violation requires the permanent revocation of all business licenses. § 23-212.01(F)(2).
*593 With respect to both knowing and intentional violations, a violation qualifies as a “second violation” only if it occurs at the same business location as the first violation, during the time that the employer is already on probation for a violation at that location. §§23-212(F)(3)(a)-(b); §§23-212.01(F) (3)(a)-(b).
The Arizona law also requires that “every employer, after hiring an employee, shall verify the employment eligibility of the employee” by using E-Verify. § 23-214(A)[3] “[P]roof of verifying the employment authorization of an employee through the e-verify program creates a rebuttable presumption that an employer did not knowingly employ an unauthorized alien.” §23-212(1).
C
The Chamber of Commerce of the United States and various business and civil rights organizations (collectively Chamber of Commerce or Chamber) filed a pre-enforcement suit in federal court against those charged with administering the Arizona law: more than a dozen Arizona county attorneys, the Governor of Arizona, the Arizona attorney general, the Arizona registrar of contractors, and the director of the Arizona Department of Revenue (collectively Arizona).[4] *594 The Chamber argued that the Arizona law’s provisions allowing the suspension and revocation of business licenses for employing unauthorized aliens were both expressly and impliedly preempted by federal immigration law, and that the mandatory use of E-Verify was impliedly preempted.
The District Court held that Arizona’s law was not preempted. 534 F. Supp. 2d 1036. It found that the plain language of IRCA’s preemption clause did not preempt the Arizona law because the state law does no more than impose licensing conditions on businesses operating within the State. Id., at 1045-1046. With respect to E-Verify, the court concluded that although Congress had made the program voluntary at the national level, it had expressed no intent to prevent States from mandating participation. Id., at 1055-1057. The Court of Appeals affirmed the District Court in all respects, holding that Arizona’s law was a “ ‘licensing and similar law[]’” falling within IRCA’s saving clause and that none of the state law’s challenged provisions was “expressly or impliedly preempted by federal policy.” 558 F. 3d, at 860, 861, 866.
We granted certiorari. 561 U. S. 1024 (2010).
II
The Chamber of Commerce argues that Arizona’s law is expressly preempted by IRCA’s text and impliedly preempted because it conflicts with federal law. We address each of the Chamber’s arguments in turn.
A
When a federal law contains an express preemption clause, we “focus on the plain wording of the clause, which necessarily contains the best evidence of Congress’ preemptive intent.” CSX Transp., Inc. v. Easterwood, 507 U. S. 658, 664 (1993).
IRCA expressly preempts States from imposing “civil or criminal sanctions” on those who employ unauthorized *595 aliens, “other than through licensing and similar laws.” 8 U. S. C. § 1324a(h)(2). The Arizona law, on its face, purports to impose sanctions through licensing laws. The state law authorizes state courts to suspend or revoke an employer’s business licenses if that employer knowingly or intentionally employs an unauthorized alien. Ariz. Rev. Stat. Ann. §§23-212(A) and (F); §§23-212.01(A) and (F). The Arizona law defines “license” as “any agency permit, certificate, approval, registration, charter or similar form of authorization that is required by law and that is issued by any agency for the purposes of operating a business in” the State. §23-211(9)(a). That definition largely parrots the definition of “license” that Congress codified in the Administrative Procedure Act. See 5 U. S. C. § 551(8) (“ Tícense’ includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission”).
Apart from that general definition, the Arizona law specifically includes within its definition of “license” documents such as articles of incorporation, certificates of partnership, and grants of authority to foreign companies to transact business in the State. Ariz. Rev. Stat. Ann. §23-211(9). These examples have clear counterparts in the APA definition just quoted. See 5 U. S. C. § 551(8) (defining “license” as including a “registration” or “charter”).
A license is “a right or permission granted in accordance with law ... to engage in some business or occupation, to do some act, or to engage in some transaction which but for such license would be unlawful.” Webster’s Third New International Dictionary 1304 (2002). Articles of incorporation and certificates of partnership allow the formation of legal entities and permit them as such to engage in business and transactions “which but for such” authorization “would be unlawful.” Ibid.) see Ariz. Rev. Stat. Ann. §§ 10-302,10-302(11) (West 2004) (articles of incorporation allow a corporation “to carry out its business and affairs” and to “[cjonduct *596 its business”); see also § 10-202(A)(3) (West Supp. 2010). As for state-issued authorizations for foreign businesses to operate within a State, we have repeatedly referred to those as “licenses.” See, e.g., Helicopteros Nacionales de Colombia, S. A. v. Hall, 466 U. S. 408, 417 (1984); G. D. Searle & Co. v. Cohn, 455 U. S. 404, 413, n. 8 (1982); Rosenberg Bros. & Co. v. Curtis Brown Co., 260 U. S. 516, 518 (1923). Moreover, even if a law regulating articles of incorporation, partnership certificates, and the like is not itself a “licensing law,” it is at the very least “similar” to a licensing law, and therefore comfortably within the saving clause. 8 U. S. C. § 1324a(h)(2).[5]
The Chamber and the United States as amicus argue that the Arizona law is not a “licensing” law because it operates only to suspend and revoke licenses rather than to grant them. Again, this construction of the term runs contrary to the definition that Congress itself has codified. See 5 U. S. C. § 551(9) (“ ‘licensing’ includes agency process re *597 specting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license” (emphasis added)). It is also contrary to common sense. There is no basis in law, fact, or logic for deeming a law that grants licenses a licensing law, but a law that suspends or revokes those very licenses something else altogether.
The Chamber also submits that the manner in which Congress amended a related statute when enacting IRCA supports a narrow interpretation of the saving clause. The Migrant and Seasonal Agricultural Worker Protection Act (AWPA), 29 U. S. C. § 1801 et seq., requires employers to secure a registration certificate from the Department of Labor before engaging in any “farm labor contracting activity.” § 1811(a). Prior to IRCA, AWPA had contained its own prohibition on hiring unauthorized workers, with accompanying adjudication procedures. See § 1813(a); § 1816(a) (1982 ed.) (repealed by IRCA, 100 Stat. 3372); §§ 1851(a)-(b) (1982 ed.) (amended by IRCA, 100 Stat. 3372). When Congress enacted IRCA, it repealed AWPA’s separate unauthorized worker prohibition and eliminated the associated adjudication process. Under the current state of the law, an AWPA certification may be denied based on a prior IRCA violation. § 1813(a)(6) (2006 ed.). And once obtained, that certification can be revoked because of the employment of an unauthorized alien only following a finding of an IRCA violation. Ibid.
The Chamber asserts that IRCA’s amendment of AWPA shows that Congress meant to allow state licensing sanctions only after a federal IRCA adjudication, just as adverse action under AWPA can now be taken only through IRCA’s procedures. But the text of IRCA’s saving clause says nothing about state licensing sanctions being contingent on prior federal adjudication, or indeed about state licensing processes at all. The simple fact that federal law creates procedures for federal investigations and adjudications culminat *598 ing in federal civil or criminal sanctions does not indicate that Congress intended to prevent States from establishing their own procedures for imposing their own sanctions through licensing. Were AWPA not amended to conform with IRCA, two different federal agencies would be responsible for administering two different unauthorized alien employment laws. The conforming amendments eliminated that potential redundancy and centralized federal adjudicatory authority. That hardly supports a conclusion that any state licensing programs must also be contingent on the cen-. tral federal system.
In much the same vein, the Chamber argues that Congress’s repeal of “AWPA’s separate prohibition concerning unauthorized workers belies any suggestion that IRCA meant to authorize each of the 50 States ... to impose its own separate prohibition,” and that Congress instead wanted uniformity in immigration law enforcement. Brief for Petitioners 86. Justice Breyer also objects to the departure from “one centralized enforcement scheme” under federal law. Post, at 617 (dissenting opinion). But Congress expressly preserved the ability of the States to impose their own sanctions through licensing; that — like our federal system in general — necessarily entails the prospect of some departure from homogeneity. And as for “separate prohibition[s],” it is worth recalling that the Arizona licensing law is based exclusively on the federal prohibition — a court reviewing a complaint under the Arizona law may “consider only the federal government’s determination” with respect to “whether an employee is an unauthorized alien.” § 23-212(H).
Even more boldly, the Chamber contends that IRCA’s saving clause was intended to allow States to impose licensing sanctions solely on AWPA-related farm contracting licensees. AWPA specifically recognized that federal regulation of farm contracting licensing was only “intended to supplement State law,” 29 U. S. C. § 1871, and the Chamber ar *599 gues that the purpose of IRCA’s saving clause was limited to preserving existing state farm contractor licensing programs. But here again no such limit is remotely discernible in the statutory text. Absent any textual basis, we are not inclined to limit so markedly the otherwise broad phrasing of the saving clause. See United States v. Shreveport Grain & Elevator Co., 287 U. S. 77, 83 (1932) (“extrinsic aids to construction” may be used “to solve, but not to create an ambiguity” (emphasis and internal quotation marks omitted)).
The Chamber argues that its textual and structural arguments are bolstered by IRCA’s legislative history. We have already concluded that Arizona’s law falls within the plain text of IRCA’s saving clause. And, as we have said before, Congress’s “authoritative statement is the statutory text, not the legislative history.” Exxon Mobil Corp. v. Allapattah Services, Inc., 545 U. S. 546, 568 (2005); see also Hoffman Plastic Compounds, Inc. v. NLRB, 535 U. S. 137, 149-150, n. 4 (2002). Whatever the usefulness of relying on legislative history materials in general, the arguments against doing so are particularly compelling here. Beyond verbatim recitation of the statutory text, all of the legislative history documents related to IRCA save one fail to discuss the saving clause at all. The Senate Judiciary Committee Report on the Senate version of the law does not comment on it. See S. Rep. No. 99-132 (1985). Only one of the four House Reports on the law touches on the licensing exception, see H. R. Rep. No. 99-682, pt. 1, p. 58 (1986), and we have previously dismissed that very report as “a rather slender reed” from “one House of a politically divided Congress.” Hoffman, supra, at 149-150, n. 4. And the Conference Committee Report does not discuss the scope of IRCA’s preemption provision in any way. See H. Conf. Rep. No. 99-1000 (1986).[6]
*600 IRCA expressly preempts some state powers dealing with the employment of unauthorized aliens and it expressly preserves others. We hold that Arizona’s licensing law falls well within the confines of the authority Congress chose to leave to the States and therefore is not expressly preempted.
B
As an alternative to its express preemption argument, the Chamber contends that Arizona’s law is impliedly preempted because it conflicts with federal law. At its broadest level, the Chamber’s argument is that Congress “intended the federal system to be exclusive,” and that any state system therefore necessarily conflicts with federal law. Brief for Petitioners 39. But Arizona’s procedures simply implement the sanctions that Congress expressly allowed Arizona to pursue through licensing laws. Given that Congress spe *601 eifically preserved such authority for the States, it stands to reason that Congress did not intend to prevent the States from using appropriate tools to exercise that authority.
And here Arizona went the extra mile in ensuring that its law closely tracks IRCA’s provisions in all material respects. The Arizona law begins by adopting the federal definition of who qualifies as an “unauthorized alien.” Compare 8 U. S. C. § 1324a(h)(3) (an “unauthorized alien” is an alien not “lawfully admitted for permanent residence” or not otherwise authorized by federal law to be employed) with Ariz. Rev. Stat. Ann. §23-211(11) (adopting the federal definition of “unauthorized alien”); see De Canas, 424 U. S., at 363 (finding no preemption of state law that operates “only with respect to individuals whom the Federal Government has already declared cannot work in this country”).
Not only that, the Arizona law expressly provides that state investigators must verify the work authorization of an allegedly unauthorized alien with the Federal Government, and “shall not attempt to independently make a final determination on whether an alien is authorized to work in the United States.” §23-212(B). What is more, a state court “shall consider only the federal government’s determination” when deciding “whether an employee is an unauthorized alien.” §23-212(H) (emphasis added). As a result, there can by definition be no conflict between state and federal law as to worker authorization, either at the investigatory or adjudicatory stage.[7]
*602 The federal determination on which the State must rely is provided under 8 U. S. C. § 1373(c). See swpra, at 591-592. That provision requires the Federal Government to “verify or ascertain” an individual's “citizenship or immigration status” in response to a state request. Justice Breyer is concerned that this information “says nothing about work authorization.” Post, at 619 (dissenting opinion). Justice Sotomayor shares that concern. Post, at 639 (dissenting opinion). But if a § 1373(c) inquiry reveals that someone is a United States citizen, that certainly answers the question whether that individual is authorized to work. The same would be true if the response to a § 1373(c) query disclosed that the individual was a lawful permanent resident alien or, on the other hand, had been ordered removed. In any event, if the information provided under § 1373(e) does not confirm that an employee is an unauthorized alien, then the State cannot prove its case. See Brief for Respondents 50, n. 10 (“if the information from the federal authorities does not establish that a person is an unauthorized alien, it means that the county attorney cannot satisfy his burden of proof in an enforcement action”); Tr. of Oral Arg. 47.
From this basic starting point, the Arizona law continues to trace the federal law. Both the state and federal law prohibit “knowingly” employing an unauthorized alien. Compare 8 U. S. C. § 1324a(a)(l)(A) with Ariz. Rev. Stat. Ann. §23-212(A).[8] But the state law does not stop there in guarding against any conflict with the federal law. The Arizona law provides that “ ‘[k]nowingly employ an unauthor *603 ized alien’ means the actions described in 8 United States Code § 1324a,” and that the “term shall be interpreted consistently with 8 United States Code § 1324a and any applicable federal rules and regulations.” §23-211(8).
The Arizona law provides employers with the same affirmative defense for good-faith compliance with the 1-9 process as does the federal law. Compare 8 U. S. C. § 1324a(a)(3) (“A person or entity that establishes that it has complied in good faith with the [employment verification] requirements of [§ 1324a(b)] with respect to hiring ... an alien ... has established an affirmative defense that the person or entity has not violated” the law) with Ariz. Rev. Stat. Ann. §23-212(J) (“an employer that establishes that it has complied in good faith with the requirements of 8 United States Code section 1324a(b) establishes an affirmative defense that the employer did not knowingly employ an unauthorized alien”).[9] And both the federal and Arizona law accord employers a rebuttable presumption of compliance with the law when they use E-Verify to validate a finding of employment eligibility. Compare IIRIRA § 402(b), 110 Stat. 3009-656 to 3009-657, with Ariz. Rev. Stat. Ann. § 23-212(1).
Apart from the mechanics of the Arizona law, the Chamber argues more generally that the law is preempted because it upsets the balance that Congress sought to strike when enacting IRCA. In the Chamber’s view, IRCA reflects Congress’s careful balancing of several policy considerations— *604 deterring unauthorized alien employment, avoiding burdens on employers, protecting employee privacy, and guarding against employment discrimination. According to the Chamber, the harshness of Arizona’s law “ ‘exert[s] an extraneous pull on the scheme established by Congress’ ” that impermissibly upsets that balance. Brief for Petitioners 45 (quoting Buckman Co. v. Plaintiffs’ Legal Comm., 531 U. S. 341, 353 (2001)); see Brief for Petitioners 42-45; Reply Brief for Petitioners 20.
As an initial matter, the cases on which the Chamber relies in advancing this argument all involve uniquely federal areas of regulation. See American Ins. Assn. v. Garamendi, 539 U. S. 396, 401, 405-406 (2003) (Presidential conduct of foreign policy); Crosby v. National Foreign Trade Council, 530 U. S. 363, 373-374 (2000) (foreign affairs power); Buckman, swpra, at 352 (fraud on a federal agency); United States v. Locke, 529 U. S. 89, 97, 99 (2000) (regulation of maritime vessels); Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U. S. 141, 143-144 (1989) (patent law). Regulating in-state businesses through licensing laws has never been considered such an area of dominant federal concern.
Furthermore, those cases all concern state actions that directly interfered with the operation of the federal program. In Buckman, for example, the Court determined that allowing a state tort action would cause applicants before a federal agency “to submit a deluge of information that the [agency] neither wants nor needs, resulting in additional burdens on the [agency’s] evaluation of an application,” and harmful delays in the agency process. 531 U. S., at 351. In Garamendi, a state law imposing sanctions on insurance companies directly “thwart[ed] the [Federal] Government’s policy of repose” for insurance companies that participated in an international program negotiated by the President. 539 U. S., at 425. Crosby involved a state law imposing sanctions on any entity doing business with Burma, a law that left the President with “less to offer and less economic and *605 diplomatic leverage” in exercising his foreign affairs powers. 530 U. S., at 377. The state law in Bonito Boats extended patent-like protection “for subject matter for which patent protection has been denied or has expired,” “thus eroding the general rule of free competition upon which the attractiveness of the federal patent bargain depends.” 489 U. S., at 159, 161. And the portions of Locke on which the Chamber relies involved state efforts “to impose additional-unique substantive regulation on the at-sea conduct of vessels” — “an area where the federal interest has been manifest since the beginning of our Republic.” 529 U. S., at 106, 99. There is no similar interference with the federal program in this case; that program operates unimpeded by the state law.
License suspension and revocation are significant sanctions. But they are typical attributes of a licensing regime. Numerous Arizona laws provide for the suspension or revocation of licenses for failing to comply with specified state laws. See, e.g., Ariz. Rev. Stat. Ann. §§5-108.05(D), 32-852.0KL), 32-1154(B), 32-1451(M), 41-2186 (West 2002). Federal law recognizes that the authority to license includes the authority to suspend, revoke, annul, or withdraw a license. See 5 U. S. C. §551(9). Indeed, AWPA itself — on which the Chamber so heavily relies — provides that AWPA “certificates of registration” can be suspended or revoked for employing an unauthorized alien. 29 U. S. C. § 1813(a)(6). It makes little sense to preserve state authority to impose sanctions through licensing, but not allow States to revoke licenses when appropriate as one of those sanctions.
The Chamber and Justice Breyer assert that employers will err on the side of discrimination rather than risk the “‘business death penalty’” by “hiring unauthorized workers.” Post, at 617 (dissenting opinion); see Brief for Petitioners 3, 35. That is not the choice. License termination is not an available sanction simply for “hiring unauthorized workers.” Only far more egregious violations of the law trigger that consequence. The Arizona law covers only *606 knowing or intentional violations. The law’s permanent licensing sanctions do not come into play until a second knowing or intentional violation at the same business location, and only if the second violation occurs while the employer is still on probation for the first. These limits ensure that licensing sanctions are imposed only when an employer’s conduct fully justifies them. An employer acting in good faith need have no fear of the sanctions.
As the Chamber points out, IRCA has its own antidiscrimination provisions, see 8 U. S. C. §§ 1324b(a)(l), (g)(1)(B) (imposing sanctions for discrimination “against any individual . . . with respect to the hiring ... or the discharging of the individual from employment”); Arizona law certainly does nothing to displace those. Other federal laws, and Arizona antidiscrimination laws, provide further protection against employment discrimination — and strong incentive for employers not to discriminate. See, e. g., 42 U. S. C. § 2000e-2(a) (prohibiting discrimination based on “race, color, religion, sex, or national origin”); Ariz. Rev. Stat. Ann. §41-1463(B)(1) (West Supp. 2010) (prohibiting employment discrimination based on “race, color, religion, sex, age or national origin”).
All that is required to avoid sanctions under the Legal Arizona Workers Act is to refrain from knowingly or intentionally violating the employment law. Employers enjoy safe harbors from liability when they use the 1-9 system and E-Verify — as Arizona law requires them to do. The most rational path for employers is to obey the law — both the law barring the employment of unauthorized aliens and the law prohibiting discrimination — and there is no reason to suppose that Arizona employers will choose not to do so.
As with any piece of legislation, Congress did indeed seek to strike a balance among a variety of interests when it enacted IRCA. Part of that balance, however, involved allocating authority between the Federal Government and *607 the States. The principle that Congress adopted in doing so was not that the Federal Government can impose large sanctions, and the States only small ones. IRCA instead preserved state authority over a particular category of sanctions — those imposed “through licensing and similar laws.”
Of course Arizona hopes that its law will result in more effective enforcement of the prohibition on employing unauthorized aliens. But in preserving to the States the authority to impose sanctions through licensing laws, Congress did not intend to preserve only those state laws that would have no effect. The balancing process that culminated in IRCA resulted in a ban on hiring unauthorized aliens, and the state law here simply seeks to enforce that ban.
Implied preemption analysis does not justify a “freewheeling judicial inquiry into whether a state statute is in tension with federal objectives”; such an endeavor “would undercut the principle that it is Congress rather than the courts that pre-empts state law.” Gade v. National Solid Wastes Management Assn., 505 U. S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in judgment); see Silkwood v. Kerr-McGee Corp., 464 U. S. 238, 256 (1984). Our precedents “establish that a high threshold must be met if a state law is to be pre-empted for conflicting with the purposes of a federal Act.” Gade, supra, at 110. That threshold is not met here.
Ill
The Chamber also argues that Arizona’s requirement that employers use the federal E-Verify system to determine whether an employee is authorized to work is impliedly preempted. In the Chamber’s view, “Congress wanted to develop a reliable and non-burdensome system of work-authorization verification” that could serve as an alternative to the 1-9 procedures, and the “mandatory use of E-Verify impedes that purpose.” 558 F. 3d, at 866.
*608 A
We begin again with the relevant text. The provision of IIRIRA setting up the program that includes E-Verify contains no language circumscribing state action. It does, however, constrain federal action: Absent a prior violation of federal law, “the Secretary of Homeland Security may not require any person or other entity [outside of the Federal Government] to participate in a pilot program” such as E-Verify. IIRIRA § 402(a), 110 Stat. 3009-656. That provision limits what the Secretary of Homeland Security may do — nothing more.
The Federal Government recently argued just that, and approvingly referenced Arizona’s E-Verify law when doing so. In 2008, an Executive Order mandated that executive agencies require federal contractors to use E-Verify as a condition of receiving a federal contract. See Exec. Order No. 13465, 73 Fed. Reg. 33286 (2008). When that order and its implementing regulation were challenged, the Government pointed to Arizona’s E-Verify mandate as an example of a permissible use of that system: “[T]he State of Arizona has required all public and private employers in that State to use E-Verify .... This is permissible because the State of Arizona is not the Secretary of Homeland Security.” Defendants’ Reply Memorandum in Support of Their Motion for Summary Judgment in No. 8:08-cv-03444 (D Md.), p. 7 (emphasis added), appeal dism’d, No. 09-2006 (CA4, Dec. 14, 2009).
Arizona’s use of E-Verify does not conflict with the federal scheme. The Arizona law requires that “every employer, after hiring an employee, shall verify the employment eligibility of the employee” through E-Verify. Ariz. Rev. Stat. Ann. §23-214(A) (West Supp. 2010). That requirement is entirely consistent with the federal law. And the consequences of not using E-Verify under the Arizona law are the same as the consequences of not using the system under federal law. In both instances, the only result is that the em *609 ployer forfeits the otherwise available rebuttable presumption that it complied with the law. Compare IIRIRA § 402(b)(1) with Ariz. Rev. Stat. Ann. §23-212(I).[10]
B
Congress’s objective in authorizing the development, of E-Verify was to ensure reliability in employment authorization verification, combat counterfeiting of identity documents, and protect employee privacy. 8 U. S. C. § 1324a(d)(2). Arizona’s requirement that employers operating within its borders use E-Verify in no way obstructs achieving those aims.
In fact, the Federal Government has consistently expanded and encouraged the use of E-Verify. When E-Verify was created in 1996, it was meant to last just four years and it was made available in only six States. IIRIRA §§ 401(b) and (c)(1), 110 Stat. 3009-655 to 3009-656. Congress since has acted to extend the E-Verify program’s existence on four separate occasions, the most recent of which ensures the program’s vitality through 2012.[11] And in 2003 Congress directed the Secretary of Homeland Security to make E-Verify available in all 50 States. 117 Stat. 1944; IIRIRA § 401(c)(1), 110 Stat. 3009-656. The Department of Homeland Security has even used “billboard and radio advertisements ... to encourage greater participation” in the E-Verify program. 534 F. Supp. 2d, at 1056.
The Chamber contends that “if the 49 other States followed Arizona’s lead, the state-mandated drain on federal *610 resources would overwhelm the federal system and render it completely ineffective, thereby defeating Congress’s primary objective in establishing E-Verify.” Brief for Petitioners 50-51. Whatever the legal significance of that argument, the United States does not agree with the factual premise. According to the Department of Homeland Security, “the E-Verify system can accommodate the increased use that the Arizona statute and existing similar laws would create.” Brief for United States as Amicus Curiae 34. And the United States notes that “[t]he government continues to encourage more employers to participate” in E-Verify. Id., at 31.
The Chamber has reservations about E-Verify’s reliability, see Brief for Petitioners 49, n. 27, but again the United States disagrees. The Federal Government reports that “E-Verify’s successful track record ... is borne out by findings documenting the system’s accuracy and participants’ satisfaction.” Brief for United States as Amicus Curiae 31. Indeed, according to the Government, the program is “the best means available to determine the employment eligibility of new hires.” U. S. Dept, of Homeland Security, U. S. Citizenship and Immigration Services, E-Verify User Manual for Employers 4 (Sept. 2010).[12]
*611 * * *
IRCA expressly reserves to the States the authority to impose sanctions on employers hiring unauthorized workers, through licensing and similar laws. In exercising that authority, Arizona has taken the route least likely to cause tension with federal law. It uses the Federal Government’s own definition of “unauthorized alien,” it relies solely on the Federal Government’s own determination of who is an unauthorized alien, and it requires Arizona employers to use the Federal Government’s own system for checking employee status. If even this gives rise to impermissible conflicts with federal law, then there really is no way for the State to implement licensing sanctions, contrary to the express terms of the saving clause.
Because Arizona’s unauthorized alien employment law fits within the confines of IRC A’s saving clause and does not conflict with federal immigration law, the judgment of the United States Court of Appeals for the Ninth Circuit is affirmed.

It is so ordered.

Justice Kagan took no part in the consideration or decision of this case.

(Justice Thomas joins Parts I, II-A, and III-A of this opinion and concurs in the judgment.

 See Conn. Gen. Stat. §31-51k (1973) (enacted 1972); Del. Code Ann., Tit. 19, §705 (1978 Cum. Supp.) (enacted 1976); Fla. Stat. §448.09 (1981) (enacted 1977); Kan. Stat. Aim. §21-4409 (1981) (enacted 1973); 1985 La. Acts p. 1894; 1977 Me. Acts p. 171; 1976 Mass. Acts p. 641; Mont. Code Ann. §41-121 (1977 Cum. Supp.); N. H. Rev. Stat. Ann. §275-A:4-a (1986 Cum. Supp.) (enacted 1976); 1977 Vt. Laws p. 320; 1977 Va. Aets ch. 438.

 See, e.g., Colo. Rev. Stat. Ann. §8-17.5-102 (2008); Miss. Code Ann. § 71-ll-3(7)(e) (Supp. 2010); Mo. Rev. Stat. §§285-525,285-535 (2009 Cum. Supp.); Pa. Stat. Ann., Tit. 73, §820.311 (Purdon Supp. 2010); S. C. Code Ann. § 41-8-50(D)(2) (Supp. 2010); Tenn. Code Ann. §50-l-103(d) (2008); Va. Code Ann. §2.2-4311.1 (Lexis 2008); W. Va. Code Ann. §21-1B-7 (Lexis Supp. 2010).

 Several States have passed statutes mandating the use of E-Verify. See, e.g., Miss. Code Ann. §§71-ll-3(3)(d), (4)(b)(i) (Supp. 2010); S. C. Code Ann. §§ 41-8-20(BHC) (Supp. 2010); Utah Code Ann. §13-47-201(1) (Lexis Supp. 2010); Va. Code Ann. §40.1-11.2 (Lexis Supp. 2010).

 No suits had been brought under the Arizona law when the complaint in this ease was filed. As of the date that Arizona submitted its merits brief to this Court only three enforcement actions had been pursued against Arizona employers. See Arizona v. Waterworld Ltd. Partnership, No. CV2009-038848 (Maricopa Cty. Super. Ct., filed Dec. 21, 2009) (resolved by consent judgment); Arizona v. Danny’s Subway Inc., No. CV2010-005886 (Maricopa Cty. Super. Ct., filed Mar. 9, 2010) (resolved by consent decree); Arizona v. Scottsdale Art Factory, LLC, No. CV2009-036359 (Maricopa Cty. Super. Ct., filed Nov. 18, 2009) (pending).

 Justice Beeyeb recognizes that Arizona’s definition of the word “license” comports with dictionaries’ treatment of the term, but argues that “license” must be read in a more restricted way so as not to include things such as “marriage licenses” and “dog licenses].” Post, at 612-613, 622 (dissenting opinion). Luckily, we need not address such fanciful hypotheticals; Arizona limits its definition of “license” to those state permissions issued “for the purposes of operating a business” in the State. Ariz. Rev. Stat. Ann. § 23-211(9)(a) (West Supp. 2010).
Justice Beeyee’s primary concern appears to be that state permissions such as articles of incorporation and partnership certificates are treated as “licensing and similar laws.” Because myriad other licenses are required to operate a business, that concern is largely academic. See §42-5005(A) (West 2006) (Corporations that receive “gross proceeds of sales or gross income upon which a privilege tax is imposed ... shall make application to the department for a privilege license.” Such a corporation “shall not engage or continue in business until the [corporation] has obtained a privilege license”). Suspending or revoking an employer’s articles of incorporation will often be entirely redundant. See §§42-5010, 42-5061 to 42-5076 (West 2006 and Supp. 2010) (describing when transaction privilege tax licenses are required).

 Justice Breyek poses several rhetorical questions challenging our reading of IRCA and then goes on to propose two seemingly alternative views of the phrase “licensing and similar laws” — that it was meant to *600 refer to “employment-related licensing systems,” post, at 621 (dissenting opinion) (emphasis deleted), or, even more narrowly, to “the licensing of firms in the business of recruiting or referring workers for employment, such as . . . state agricultural labor contractor licensing schemes,” post, at 622-623. If we are asking questions, a more telling one may be why, if Congress had intended sueh limited exceptions to its prohibition on state sanctions, it did not simply say so, instead of excepting “licensing and similar laws” generally?
Justice Sotomayor takes a different tack. Invoking arguments that resemble those found in our implied preemption cases, she concludes that the Arizona law “falls outside” the saving clause and is expressly preempted because it allows “state courts to determine whether a person has employed an unauthorized alien.” Post, at 631 (dissenting opinion). While Justice Breyer would add language to the statute narrowly limiting the phrase “licensing and similar laws” to specific types of licenses, Justice Sotomayor creates an entirely new statutory requirement: She would allow States to impose sanctions through “licensing and similar laws” only after a federal adjudication. Such a requirement is found nowhere in the text, and Justice Sotomayor does not even attempt to link it to a specific textual provision.
It should not be surprising that the two dissents have sharply different views on how to read the statute. That is the sort of thing that can happen when statutory analysis is so untethered from the text.

 After specifying that a state court may consider “only” the federal determination, the Arizona law goes on to provide that the federal determination is “a rebuttable presumption of the employee’s lawful status,” Ariz. Rev. Stat. Ann. §23-212(H) (West Supp. 2010). Arizona explains that this provision does not permit the State to establish unlawful status apart from the federal determination — the provision could hardly do that, given the foregoing. It instead operates to “ensur[e] that the employer has an opportunity to rebut the evidence presented to establish a worker’s unlawful status.” Brief for Respondents 49 (emphasis added). Only in that sense is the federal determination a “rebuttable presumption.” See *602 Tr. of Oral Arg. 46-47. Giving an employer a chance to show that it did not break the state law certainly does not place the Arizona regime in conflict with federal law.

 State law also prohibits “intentionally” employing an unauthorized alien, §23-212.01(A), a more severe violation of the law. The Chamber does not suggest that this prohibition is any more problematic than the prohibition on “knowingly” employing an unauthorized alien.

 The Chamber contends that the Arizona law conflicts with federal law because IRCA prohibits the use of the 1-9 form and “any information contained in or appended to [it]” from being “used for purposes other than for enforcement of” IRCA and other specified federal laws. 8 U. S. C. § 1324a(b)(5). That argument mistakenly assumes that an employer would need to use the 1-9 form or its supporting documents themselves to receive the benefit of the affirmative defense in Arizona court. In fact, “[a]n employer [could] establish good faith compliance with [the] 1-9 process!] • • • through testimony of employees and descriptions of office policy.” Brief for Respondents 52; see Tr. of Oral Arg. 33.

 Arizona has since amended its statute to include other consequences, such as the loss of state-allocated economic development incentives. See 2008 Ariz. Sess. Laws ch. 152. Because those provisions were not part of the statute when this suit was brought, they are not before us and we do not address their interaction with federal law.

 See Basie Pilot Extension Act of 2001, §2, 115 Stat. 2407; Basic Pilot Program Extension and Expansion Act of 2003, § 2,117 Stat. 1944; Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009, Div. A, § 143, 122 Stat. 3580; Department of Homeland Security Appropriations Act, 2010, § 547, 123 Stat. 2177.

 Justice Breyer shares the Chamber’s concern about E-Verify’s accuracy, See post, at 618-619, 629. Statistics from Fiscal Year 2010, however, indicate that of the 15,640,167 E-Verify cases submitted, 98.3% were automatically confirmed as work authorized, 0.3% were confirmed as work authorized after contesting and resolving an initial nonconfirmation — an avenue available to all workers — and 1.43% were not found work authorized. E-Verify Statistics and Reports, available at http://www.uscis.gov/ portal/site/uscis/menuitem/statistics (as visited May 23,2011, and available in Clerk of Court’s case file). As Justice Breyer notes, the initial mismatches (the 0.3%) are frequently due to ‘“incorrectly spelled [names] in government databases or on identification documents.’” Post, at 629. Such a hazard is of course not unique to E-Verify. Moreover, Justice Breyer’s statistical analysis underlying his conclusion that E-Verify queries, at least initially, wrongly “suggest!] that an individual [i]s not lawfully employable” “18 percent of the time” needs to be understood for what *611 it is. Post, at 618-619. If E-Verify initially indicated that two individuals were not found work authorized, and later revealed that one of those determinations was incorrect, Justice Breyer would be able to exclaim that the error rate was 50%.