612                    March 3, 2016                    No. 6

IN THE SUPREME COURT OF THE
STATE OF OREGON

Cynthia KENDOLL,
*Petitioner,*

*v.*

Ellen F. ROSENBLUM,
Attorney General, State of Oregon,
*Respondent.*

(S063675)

En Banc

On petition to review ballot title filed November 13, 2015, considered and under advisement on January 26, 2016.

Jill Gibson, Gibson Law Firm, Portland, filed the petition and reply for petitioner.

Carson L. Whitehead, Assistant Attorney General, Salem, filed the answering memorandum for respondent. With him on the answering memorandum were Ellen F. Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

Gregory A. Chaimov, Davis Wright Tremaine LLP, Portland, filed the memorandum for *amici curiae* ACLU Foundation of Oregon, David Rogers, Rev. Joseph Santos-Lyons, Kayse Jama, Andrea Miller, and Jeff Stone.

KISTLER, J.

Ballot title referred to Attorney General for modification.

**KISTLER, J.**

Petitioner seeks review of the Attorney General's certified ballot title for Initiative Petition 52 (2016) (IP 52). *See* ORS 250.085(2) (specifying requirements for seeking review of certified ballot titles). We review the ballot title to determine whether it substantially complies with ORS 250.035(2). *See* ORS 250.085(2)(5) (stating standard of review). For the reasons explained below, we refer the ballot title to the Attorney General for modification.

IP 52, if enacted, would supplement federal immigration law. We accordingly describe the relevant federal law briefly before describing the state requirements that IP 52 would add. Federal immigration law makes it unlawful for "'a person or other entity * * * to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien.'" *Chamber of Commerce v. Whiting*, 563 US 582, 131 S Ct 1968, 1974, 179 L Ed 2d 1031 (2011) (quoting 8 USC § 1324a(a)(1)(A)). An "unauthorized alien" is defined as an alien "who is not 'lawfully admitted for permanent residence' or not otherwise authorized by the Attorney General to be employed in the United States." 131 S Ct at 1974 (quoting 8 USC § 1324a(h)(3)). Federal law requires employers hiring a new employee to review certain documents, such as the employee's United States passport, resident alien card, or social security card, to determine whether that person is authorized to work. *Id.* An employer must attest on a federal form (Form I-9) that it has reviewed the appropriate documents and determined that the employee is not an unauthorized alien. *Id.*

Congress has established a website, E-Verify, that permits employers to determine whether the documentation that the employer reviewed in completing Form I-9 is authentic or, more specifically, matches records on file with the federal government. *Id.* at 1975; *see* https://www.uscis.gov/e-verify/what-e-verify (accessed Feb 25, 2016) (explaining that E-Verify compares information submitted by an employer with records on file with the federal government). An employer that uses E-Verify "submits a request to [that] system based on information that the employee provides

similar to that used in the [Form] I-9 process." *Whiting*, 131 S Ct at 1975. In response, the "employer [will] receiv[e] either a confirmation or a tentative nonconfirmation of the employee's authorization to work." *Id.* Employers that use E-Verify accordingly do more than review the documentation that an employee has submitted; they receive some verification from the federal government as to the authenticity of that documentation.

Generally, federal immigration laws do not require employers to use E-Verify. *Id.* It is sufficient for the purposes of federal immigration law that an employer review certain documents, complete Form I-9, and not knowingly hire an unauthorized alien. *Id.* at 1974. However, federal law provides an incentive for employers to use E-Verify. *Id.* at 1975. Using E-Verify establishes a rebuttable presumption that an employer did not violate federal immigration laws even if it later turns out that the employer in fact hired an unauthorized alien. *Id.* (explaining that presumption).

One final point about federal law requires mention. Federal immigration law "expressly preempts 'any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment unauthorized aliens.'" *Id.* at 1973 (quoting 8 USC § 1324a(h)(2)). In *Whiting*, the Court held that the federal immigration laws did not preempt an Arizona statute that, among other things, required employers, as part of a state licensing scheme, to "verify the employment eligibility of [an] employee by using E-Verify." *Id.* at 1985 (internal quotation marks omitted). The Court explained that the Arizona statute came within the express exception from preemption for "licensing and similar laws." *Id.* at 1977-87.

IP 52 is similar but not identical to the Arizona statute at issue in *Whiting*.[1] IP 52, if enacted, would mandate what federal law only encourages. Essentially, IP 52 would add a state licensing requirement that employers use E-Verify to determine their employees' eligibility to work.

---

[1] We express no opinion on whether any differences between IP 52 and the Arizona statute in *Whiting* would affect the preemption analysis.

More specifically, IP 52 provides that, if federal law requires an employer to complete Form I-9, then the employer must "register and participate in [the] federal government's employment authorization program to verify the work authorization of every new employee within three business days after employing the new employee."[2] IP 52 § 3(b). An employer employing five or more persons may not employ or continue to employ persons whose authorization to work has not been verified.[3] *Id.* § 3(c).

The measure implements those requirements by imputing licenses to employers and suspending the employer's license if the employer fails to verify an employee's authorization to work. Specifically, if an employer employing five or more persons fails to verify a newly hired employee's authorization to work within three days, the measure requires the Oregon Secretary of State to place the employer on probation for the first violation and to "suspend the employer's license for at least thirty (30) days but not more than one (1) year" for a subsequent violation. *Id.* § 4. Additionally, the measure prohibits "all employers in Oregon" from employing "a person unless the private employer's employment license [established by IP 52] and any other applicable licenses [as defined elsewhere in the measure] are in effect and not suspended." *Id.* § 3(a).[4]

The Attorney General certified the following ballot title for IP 52:

---

[2] IP 52 defines "verify the employment authorization" to mean "us[ing] a federal government employment authorization program to determine whether a newly hired employee is authorized to be employed in the United States pursuant to 8 U.S.C. § 1324a." IP 52 § 2(h). It defines an "[e]mployment authorization program " as meaning "the E-verify Program *** or any successor program designated by the federal government to verify the employment authorization of an employee." *Id.* § 2(d).

[3] IP 52 provides that, if E-Verify returns a "tentative nonconfirmation," the employee may contest that determination. An employer may not take an adverse employment action based on the tentative nonconfirmation while the employee contests that determination.

[4] The measure refers at different points to "employers," "all employers in Oregon," "private employers," and employers "employing five or more employees." The measure is not always clear as to which employers would be subject to the different provisions in the measure, as well as the criteria that would be used to determine when an employer is "in Oregon." The ballot title appropriately does not seek to resolve those ambiguities.

### "'Imputes' 'employment license' to employers; conditions 'license' on using specified federal program for employment authorization"

"**Result of 'Yes' Vote:** 'Yes' vote 'imputes' 'employment license' to employers; 'license' (defined) required to employ any person. 'License' conditioned on verifying new employee's employment authorization using federal program.

"**Result of 'No' Vote:** 'No' vote maintains current law requiring employer to confirm employee's employment authorization using documentation; current law does not require 'employment license' or using specified program.

"**Summary:** Existing law requires employers to confirm employee's employment authorization; can use Form I-9. Measure 'imputes' new state 'employment license' to all employers. Requires employers with five or more employees to verify new employee authorization using internet-based federal program. Prohibits employing any person if employer's 'employment license' or other 'license' (defined) suspended/revoked. Penalties for noncompliance include suspension of all 'licenses' by Secretary of State, prohibiting employment of any person. Required federal program indicates employment is 'authorized' or issues 'nonconfirmation.' 'Nonconfirmation' can result from employee ineligibility/incorrect information. Employee may 'contest' 'nonconfirmation;' adverse employment action prohibited during contest. Employers must register with federal program; Oregon Employment Department shall provide technical advice, access. Secretary of State shall report penalties to federal immigration authorities. Exceptions. Other terms."

Petitioner challenges the ballot title's caption, the "yes" and "no" result statements, and the summary.

We begin with the caption. ORS 250.035(2)(a) provides that a ballot title must contain a "caption of not more than 15 words that reasonably identifies the subject matter of the state measure." A caption will reasonably identify the subject matter of a measure if it describes the "actual major effect" of the measure or, if there is more than one major effect, all that can be described within the word limit. *Lavey v. Kroger*, 350 Or 559, 563, 258 P3d 1194 (2011). To identify an "actual major effect," we consider the "changes that

the proposed measure would enact in the context of existing law." *Rasmussen v. Kroger (S059261)*, 350 Or 281, 285, 253 P3d 1031 (2011). We have recognized that

> "trying to describe all the major effects of a multifaceted, complex measure in 15 words can be difficult, and sometimes not possible. At times, it may be necessary to describe those effects generally. *See Kain v. Myers*, 336 Or 116, 121, 79 P3d 864 (2003)."

*McCann/Harmon v. Rosenblum*, 354 Or 701, 707, 320 P3d 548 (2014).

Petitioner argues that the caption fails to meet that standard for two reasons. First, she contends that the caption overemphasizes the licensing aspects of the measure while failing to mention that the measure requires verification "based on legal presence." Second, she contends that the caption should refer to E-Verify by name rather than a "specified federal program for employment authorization," which she views as a "more cumbersome and less-informative" phrase than E-Verify.

We agree with petitioner that the caption fails to substantially comply with ORS 250.035(2)(a). Federal immigration law requires that employers review certain documents to "establis[h] an employee's eligibility for employment," and it prohibits employers from knowingly hiring unauthorized aliens. *Whiting*, 131 S Ct at 1974. IP 52, if enacted, would add an additional requirement to that federal law. It would require, as a matter of state law, that employers use a federal website to verify the authenticity of the documents that federal law requires only that they review. That additional requirement is one major effect of the measure.[5] The caption, however, does not highlight that effect. Rather, as petitioner notes, the caption focuses primarily on the mechanism (the licensing scheme) by which that effect would be achieved. To

---

[5] The sanctions that the measure prescribes also could be viewed as a major effect of the measure. Not only does the measure authorize the Secretary of State to prohibit certain employers from hiring employees for up to a year for a second failure to verify an employee's documentation, but it prohibits all employers from employing persons while various other business licenses are suspended. Petitioner, however, has not challenged the caption on the ground that it fails to mention sanctions, and we consider only the challenges that petitioner has raised.

be sure, the licensing scheme has legal significance because it presumably is the means by which the proponents of the measure seek to avoid federal preemption. *See id.* at 1980 (holding that Arizona's similar requirement was not preempted because it was part of a licensing scheme). However, in focusing almost exclusively on licensure, the caption fails to identify a major effect of the measure and must be modified.

Petitioner advances two, more specific criticisms of the caption, which we discuss briefly. Petitioner argues that the caption does not alert voters that this measure is about eligibility to work "based on [an employee's] legal presence" in the United States. Perhaps the Attorney General could have chosen to highlight that aspect of the measure, but we cannot say that she had to do so. The federal government describes E-Verify as a program that determines whether an employee is either authorized or eligible to work. For example, the E-Verify website explains that E-Verify permits employers "to determine whether the information matches government records and whether the new hire is authorized to work in the United States." https://www.uscis.gov/e-verify/about-program (accessed Feb 25, 2016).[6] Similarly, the United States Supreme Court has explained that an employer that participates in E-Verify "receives either a confirmation or a tentative nonconfirmation of the employee's authorization to work." *Whiting*, 131 S Ct at 1975.

Those descriptions of E-Verify reflect the fact that E-Verify is not itself the source of a prohibition against hiring unauthorized aliens. Rather, using E-Verify, which the measure would require, results only in verifying the authenticity of documents that employers enter into that system by matching those documents against records in the federal government's possession. Given the United States Supreme

---

[6] In the same vein, the E-Verify website explains that "E-Verify *** compares information from an employee's Form I-9, Employment Eligibility Verification, to data from U.S. Department of Homeland Security and Social Security Administration records to confirm employment eligibility." https://www.uscis.gov/e-verify/what-e-verify (accessed Feb 25, 2016). It describes E-Verify as "an electronic program through which employers verify the employment eligibility of their employees after hire." https://www.uscis.gov/e-verify/about-program (accessed Feb 25, 2016).

Court's and the federal government's more limited descriptions of E-Verify, we cannot say that the caption must refer to an employee's "legal presence" to substantially comply with the requirement that the caption describe the measure's major effect.

Petitioner also argues that the caption should use the term "E-Verify" rather than a "specified federal program for employment authorization." Petitioner reasons that E-Verify is a familiar phrase, while the phrase used in the caption is cumbersome and adds no useful information. One might question the unsupported factual premise of petitioner's argument—that E-Verify is such a well-known program that its name alone is sufficient to communicate the nature of the requirement that IP 52 would add to state law. The more fundamental problem, however, with petitioner's argument is that it assumes that the use of a particular method for verifying an employee's documentation is one of the measure's major effects. As explained above, a major effect of the measure is to require employers to verify an employee's authorization to work. The means by which that effect is accomplished—whether it is by using a federal website or a telephone hot line—is, by comparison, of lesser significance. We accordingly disagree with petitioner's two specific criticisms of the caption, but we agree with her more general point that the caption's almost exclusive focus on licensure obscures a major effect of the measure.

Petitioner also challenges the "yes" and "no" results statements. Under ORS 250.035(2)(b), a ballot title must include a "simple and understandable" statement of no more than 25 words that describes the result if the measure is approved. A "yes" result statement "should describe the most significant and immediate effects of the ballot initiative for the general public." *McCann*, 354 Or at 707 (citation and internal quotation marks omitted). Petitioner contends that the "yes" result statement does not identify a significant and immediate effect of the measure, which is to require employers to use a federal program to verify that new employees are authorized to work in the United States. We agree, in part, with petitioner's argument for the reasons discussed above. The "yes" result statement, like the caption, focuses on the enforcement mechanism (the licensing scheme) to

the detriment of a "significant and immediate effect" of the measure.

The "no" result statement similarly needs to be a "simple and understandable" statement of no more than 25 words that describes the results if the measure is rejected. ORS 250.035(2)(c). Petitioner contends that the Attorney General's "no" result statement is inaccurate because it suggests that state law currently imposes the requirements that the "no" result statement describes. Petitioner's point is well taken. The "no" result statement says that a "'no' vote maintains current law requiring employer to confirm employee's employment authorization." The use of the word "maintains" implies inaccurately that the "current law" that the "no" result statement describes is state law. A "no" vote will not "maintain" that law any more than a "yes" vote will change it. Rather, the federal statutory requirement that the "no" result statement describes will remain unchanged regardless of whether electors vote for or against IP 52.

To be sure, this is not a case in which the failure to distinguish federal from state law requirements leaves an incorrect impression about what federal law would require if the proposed measure were not enacted. *See Starrett/ Nichols v. Myers (S47079)*, 330 Or 139, 998 P2d 671 (2000) (illustrating that situation). However, the "no" result statement's use of the word "maintains" implies incorrectly that "current law" finds its source in state rather than federal law.[7] The point is admittedly a small one, but the Attorney General acknowledges that the "yes" and "no" result statements must be accurate. Because we are referring the caption and the "yes" result statement to the Attorney General, we refer the "no" result statement to correct that inaccuracy.

Finally, we turn to the summary. ORS 250.035(2)(d) requires that the ballot title contain a "concise and impartial statement of not more than 125 words summarizing the state measure and its major effect." Petitioner raises four challenges to the summary. First, she contends that the summary should use the term "E-Verify" rather than

---

[7] As petitioner notes, the "no" result statement uses the phrase "current law" twice. The first time it refers to federal law; the second time, it could refer to federal law, state law, or both.

"internet-based federal program." As explained above, substantial compliance does not require one phrase rather than the other.

Second, petitioner argues that the summary inaccurately implies that existing state law requires "employers to confirm employee's employment authorization." For the reasons stated above, we agree that the summary should reflect that federal law is the source of that requirement.

Third, she objects to what she describes as an "unsupported and extraneous" sentence in the summary: "'Nonconfirmation' can result from employee ineligibility/incorrect information." As we understand petitioner's objection to that sentence, she concludes that it overemphasizes the possibility that an employee will receive a "nonconfirmation" and, in doing so, fails to provide an impartial explanation of the measure. The challenged sentence is part of a passage discussing the remedial procedures that are available to an employee when E-Verify shows that the information entered into E-Verify does not match the information on file in the federal government's records. The Attorney General responds that this sentence explains why an employee would need to "contest" a result.

Although we agree with petitioner that nothing in the text of the measure supports the statement that nonconfirmation can result from incorrect information, the point seems fairly obvious. If the employer or the system has incorrect information, then entering that information into E-Verify will produce an adverse result or "tentative nonconfirmation," which an employee may contest. Petitioner does not argue that the procedure for contesting an adverse result is not an appropriate subject for the summary to mention, and the sentence to which she objects is part of a larger explanation of that procedure. We are not persuaded that that sentence is either inaccurate or somehow partial, as petitioner argues.

Finally, petitioner contends that the summary improperly fails to mention that IP 52 contains an exemption for certain types of "domestic service" in private homes, arguing that this exception is "important." Petitioner provides no further explanation as to why this exception might

be more important than other exceptions. The summary accurately notes that the measure contains both "exceptions" and "other terms." Given the word limitation for summaries, we conclude that the summary is not deficient in failing to describe the limited exception for certain types of domestic service work.

For the reasons stated above, the caption, the "yes" and "no" result statements, and the summary should be modified.

Ballot title referred to Attorney General for modification.