# IN THE SUPREME COURT OF IOWA

No. 12–1645

Filed November 15, 2013

**STAFF MANAGEMENT** and **NEW HAMPSHIRE INSURANCE COMPANY,**

Appellants,

vs.

**PASCUALA JIMENEZ,**

Appellee.

_____

Appeal from the Iowa District Court for Polk County, Arthur E. Gamble, Judge.

An employer appeals a district court judgment affirming the Iowa Workers' Compensation Commissioner's decision awarding benefits. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.**

Christopher S. Spencer and Stephen W. Spencer of Peddicord, Wharton, Spencer, Hook, Barron & Wegman, LLP, West Des Moines, for appellants.

Paul J. McAndrew, Jr., Coralville, for appellee.

Kathleen Graham Sumner of Law Offices of Kathleen G. Sumner, Greensboro, North Carolina, and Thomas A. Palmer of Lawyer, Dougherty, Palmer, & Flansburg, P.L.C., West Des Moines, for amicus curiae Workers' Injury Law & Advocacy Group.

James C. Byrne of Neifert, Byrne & Ozga, P.C., West Des Moines, for amicus curiae Iowa Association of Justice's Core Group.

Rebecca Smith of National Employment Law Project, Seattle, Washington, and Mark S. Soldat of Soldat & Parrish-Sams, P.L.C., West Des Moines, for amicus curiae Iowa Citizens for Community Improvement and the National Employment Law Project.

**WIGGINS, Justice.**

In this appeal, we must first decide whether the Iowa Workers' Compensation Commissioner can award an undocumented worker healing period benefits under the Iowa Workers' Compensation Act. The commissioner and the district court held an undocumented worker is entitled to these benefits. The employer appealed and we affirm the district court judgment that an undocumented worker is entitled to healing period benefits under the Iowa Workers' Compensation Act.

Upon holding an undocumented worker is entitled to these benefits under the Iowa Workers' Compensation Act, we must also decide (1) whether substantial evidence supports the running award of healing period benefits, (2) whether the commissioner can award healing period benefits starting from a date preceding the parties' stipulation as to when the healing period should begin, and (3) whether the commissioner can award healing period benefits to the claimant during the time period she was working. The district court held substantial evidence supported the running award of healing period benefits, the commissioner was correct in starting healing period benefits at a date prior to the parties' stipulated date, and the claimant's return to work did not cut off any of her benefits. On appeal, we affirm the district court on the issues of substantial evidence and the starting date of benefits. However, we disagree with the district court judgment on the last issue and find the claimant is not entitled to healing period benefits while she was working.

Accordingly, we affirm in part and reverse in part the district court judgment. We remand the case to the district court to remand the case back to the commissioner to enter an order consistent with this decision on the issue of the running award of healing period benefits while the claimant was working.

## I. Background Facts and Proceedings.

Pascuala Jimenez is the claimant. Jimenez was forty-five years old at the time of the administrative hearing, and had lived for nineteen years in West Liberty, Iowa. Jimenez has a ninth grade education that she received in Mexico. Jimenez's past medical history relevant to this case shows that she has had four cesarean sections and a hernia repair in 1995.

Jimenez first came to the United States in 1991. She entered the United States legally with a visa. Jimenez's status permitted her to stay in the country for ten years. The government did not extend her visa. After the expiration of her visa, Jimenez could not legally work in the United States and she became an undocumented worker.

Staff Management, a temporary employment agency, employed Jimenez in 2001. Staff Management assigned Jimenez to Proctor & Gamble in Iowa City, where she had worked for about sixteen years. Jimenez worked for two other temporary employment agencies before working for Staff Management, but she worked at Proctor & Gamble the entire time.

Jimenez was a line leader and supervisor who actively participated in the work of the people she supervised. Her work entailed packing shampoo by taking bottles off the line, placing the bottles in boxes, and then placing the boxes on pallets. The boxes weighed approximately twenty-five pounds and the pallets weighed approximately fifty to sixty pounds. Every four to five minutes, Jimenez would lift a pallet if she were helping on the line.

Jimenez had very good English-speaking skills, and would frequently act as an interpreter for other employees. In her position as line leader and supervisor, she would communicate with Proctor &

Gamble technicians and managers, the majority of whom were only fluent in English. Her manager described her as a great employee.

On September 12, 2007, Jimenez experienced light cramping after placing large bottles full of shampoo in boxes. The pain went away after Jimenez gave herself a massage and waited for the pain to lessen. On September 13, Jimenez was helping another person lift a pallet when she felt a pain in her stomach and became dizzy. Unlike her pain the previous day, she was unable to move on September 13 due to the pain.

Jimenez went to Dr. Cuddihy in Coralville to treat her injury. Dr. Cuddihy diagnosed her with a right abdominal peri-umbilical hernia and a right lower abdominal hernia, and referred her to a general surgeon for evaluation. The general surgeon, Dr. Peterson, did additional testing and diagnosed Jimenez with two hernias. Dr. Peterson opined the hernias were probably work related and required surgery. Jimenez returned to work until the day of the surgery but she had to wear a large bandage.

On November 14, Jimenez underwent surgery. Jimenez identified her hernias prior to surgery as being located one to the right of her naval and the other in the groin area.

After the surgery, Jimenez continued to have pain. Dr. Peterson authorized Jimenez to return to light-duty work on December 12. On December 10 and December 12, Jimenez called Staff Management and Dr. Peterson about returning to work. In these conversations, she stated that she was not able to go back to work because of the pain. Dr. Peterson referred Jimenez to Dr. Maves to receive an injection for the pain.

On December 19, Jimenez received two injections in the abdomen. Dr. Maves told her to call if she remained in pain. Jimenez called

Dr. Maves the next day, and he told her it was normal that she was still experiencing pain. Jimenez did not call him back after that conversation because she thought he would tell her the same thing.

Jimenez returned to work on December 26 without work restrictions. However, she was unable to do her normal job, and had to ask for help from other employees. Jimenez continued to work for less than a month.

On January 22, 2008, Staff Management terminated Jimenez. Jimenez's manager stated that Staff Management terminated Jimenez because she did not have authorization to work in the United States. In November 2006, Staff Management became a charter member of the E-Verify® program, a federal program to verify employment authorization documentation of employees. On August 3, 2007, Staff Management received notice from its central office stating that Jimenez's name and social security number did not match with the Social Security Administration's records. Staff Management contacted Jimenez at least three times to let her know she needed to bring in her documentation or it could not continue to employ her.

Jimenez's manager contacted Jimenez about her termination, and stated at the administrative hearing that Staff Management also terminated ten other employees at that time. Jimenez's manager contends the reason she terminated Jimenez was the central office would not allow her to wait any longer for Jimenez's paperwork. Staff Management asked the central office for proof Jimenez was undocumented, and received an audit of individuals from U.S. Immigration and Customs Enforcement that showed Jimenez's alien registration number did not actually belong to her, and two different people used the social security number she provided. Staff Management

contends Jimenez's termination had nothing to do with her work-related injury. Staff Management believed Jimenez had recovered from her surgery and needed to comply with the E-Verify® program requirements.

Jimenez contends Staff Management had always known she did not have her documentation, and she believed Staff Management fired her because she was physically unable to work anymore. Jimenez admitted Staff Management had told her to bring in her documentation and that she could come back and reapply to work if her documentation was in order. Jimenez stated she had not applied for work after Staff Management terminated her because she was unable to do physical labor, and every job available to her required physical labor.

After Staff Management terminated Jimenez, she went to the West Liberty Clinic for medical care. The doctor at the clinic referred her back to the clinic where Dr. Peterson had practiced. Jimenez received a card that said she would have to take $200 to go to the doctor. Jimenez then tried to call Dr. Peterson, but he had moved to Washington, D.C. Jimenez did not go to the clinic to see another doctor because she did not have $200. Jimenez made efforts to go to a free clinic, but the clinic told her they could not help her. Jimenez also called Staff Management after her termination to try to see a doctor. Staff Management told her it could not help her because it no longer employed her.

On February 14, 2008, Dr. Peterson signed a maximum medical improvement and impairment document stating that Jimenez had reached maximum medical improvement (MMI) on December 26, 2007, and noting that Dr. Maves would be providing her further treatment. On May 12, Dr. Prevo, a physician retained by Staff Management to review Jimenez's records, provided an opinion of Jimenez's condition based solely upon her medical records. Dr. Prevo opined Jimenez was currently

on regular duty status without any restrictions and that there was zero percent objective impairment.

In 2009, Jimenez's attorney wrote to Staff Management indicating that Jimenez's medical condition had worsened. Jimenez also went to a doctor in Cedar Rapids and a doctor in Des Moines. Dr. Epp, in Cedar Rapids, examined Jimenez on May 11, 2010, and determined Jimenez had a hernia and she could not work until surgery repaired the hernia. Dr. Epp opined the current hernia was a sequela of the surgical correction of the previous hernias sustained in 2007. Dr. Epp further determined that Jimenez had not reached MMI.

The Des Moines doctor, Dr. Bansal, examined Jimenez on June 18, 2010. Jimenez testified Dr. Bansal advised her to go to the emergency room immediately. Dr. Bansal returned a letter to Jimenez stating Jimenez could not work until a physician repaired her hernia.

Jimenez's pain had been ongoing beginning with the original hernia surgery on November 14, 2007, and continuing until the time of the administrative hearing. After the surgery, Jimenez started feeling a bump in almost exactly the same location as the bump had been before the surgery. The bump had been growing since the surgery. Jimenez stated the hernia never went away and the pain has been worse following surgery.

On July 6, 2009, Jimenez filed for workers' compensation benefits. The petition alleged the dispute in the case was "Compensability, Rate; Date of Injury to be determined; Nature and Extent of Industrial Disability; Penalty." A deputy commissioner held an administrative hearing on the petition. Prior to the hearing on the petition, the parties filed a hearing report. The hearing report listed the following issues relevant to this appeal as in dispute:

1. Is the alleged injury the cause of a permanent disability?

2. Is the claimant entitled to either temporary total disability, temporary partial disability, or healing period benefits from January 1, 2009 through current and running?

3. Was claimant off work for reasons unrelated to her injuries?

The deputy held the hearing on July 20, 2010. At that time, the deputy reviewed the hearing report.

On October 25, the deputy issued her arbitration decision. On the issues relevant to this appeal, the deputy found Jimenez was entitled to running healing period benefits based on the medical recommendations of Dr. Epp and Dr. Bansal because the current hernia was the result of the surgical correction of the 2007 hernias. The deputy also determined the extent of Jimenez's disability was not ripe for adjudication. Finally, the deputy ordered Staff Management to pay Jimenez weekly benefits in the form of a running award, to pay all medical expenses incurred to treat the work-related injury, and to pay for future medical care and prescription charges. In sum, the deputy awarded running healing period benefits from the date of the work-related injury on September 13, 2007 until Jimenez reaches MMI.

Staff Management appealed the ruling to the commissioner. On appeal, Staff Management argued substantial evidence did not support the deputy's running award of healing period benefits, Jimenez was ineligible for benefits under the Iowa Workers' Compensation Act because she was an undocumented worker, the deputy's computation of healing period benefits was contrary to the stipulation as to when the award should start, and if the starting date of the healing period was correct, Jimenez could not receive healing period benefits during the time she

returned to work. The commissioner affirmed the arbitration decision as to all of these issues.

Staff Management filed a petition for judicial review. The district court affirmed the commissioner's decision. Staff Management appeals.

## II. Preservation of Error.

Staff Management raised the issue that Jimenez was an undocumented worker for the first time in its intraagency appeal. Normally, for an issue to be preserved, a party must present it and have it ruled upon before a court will review the issue on appeal. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

The rule is different for administrative law cases. The final agency action in a worker's compensation case is not the deputy's decision, but the decision of the workers' compensation commissioner. *See* Iowa Code § 86.24(5) (2013). We have held a party preserves error on an issue before an agency if a party raises the issue in the agency proceeding before the agency issues a final decision and both sides have had an opportunity to address the issue. *See Office of Consumer Advocate v. Iowa State Commerce Comm'n*, 465 N.W.2d 280, 283 (Iowa 1991) (finding a party preserved error by raising an issue in a petition for rehearing). By raising the issue in its intraagency appeal brief and giving Jimenez the opportunity to respond to it in her brief, Staff Management preserved this issue for our review.

## III. Issues.

In this appeal, we will decide (1) whether the workers' compensation commissioner erred in awarding Jimenez healing period benefits under the Iowa Workers' Compensation Act when Jimenez is an

undocumented worker, (2) whether substantial evidence supports the running award of healing period benefits, (3) whether the commissioner can award healing period benefits starting from a date preceding the parties' stipulation as to when the benefits should start, and (4) whether the commissioner can award healing period benefits during a time period when Jimenez was working.

**IV. Whether the Workers' Compensation Commissioner Erred in Awarding Jimenez Healing Period Benefits Under the Iowa Workers' Compensation Act Because Jimenez is an Undocumented Worker.**

Staff Management identifies three reasons we should find an undocumented worker should not receive benefits under the Iowa Workers' Compensation Act. First, Iowa does not specifically include undocumented workers in its definition of "employee" in the Iowa Workers' Compensation Act. Second, Iowa law requires a contract of service between the employer and employee to be covered by the Iowa Workers' Compensation Act, and the contract in this case would be void because of illegality. Third, even if undocumented workers are entitled to benefits under the Iowa Workers' Compensation Act, federal law preempts the availability of certain benefits, including a running healing period.

**A. Whether the Iowa Workers' Compensation Act Includes Undocumented Workers in its Definition of "Employee."** We must first address whether an undocumented worker is an "employee" under section 85.61(11) of the Iowa Workers' Compensation Act. If the legislature " 'clearly delegates discretionary authority to an agency to interpret or elaborate a statutory term . . . the court . . . may reverse the agency interpretation or elaboration only if it is arbitrary, capricious, unreasonable, or an abuse of discretion . . . .' " *Renda v. Iowa Civil*

*Rights Comm'n*, 784 N.W.2d 8, 11 (Iowa 2010) (emphasis omitted) (quoting Arthur E. Bonfield, *Amendments to Iowa Administrative Procedure Act, Report on Selected Provisions to Iowa State Bar Association and Iowa State Government* 62 (1998)). However, if the legislature did not delegate discretionary authority to the agency to interpret a statutory term, we will not give deference to the agency interpretation but "will substitute our judgment for that of the [agency] if we conclude the [agency] made an error of law." *Id.* at 14–15.

In our prior cases, we held the legislature has not delegated any interpretive authority to the workers' compensation commissioner to interpret Iowa Code chapter 85. *See Waldinger Corp. v. Mettler*, 817 N.W.2d 1, 4–5 (Iowa 2012). The same analysis applies to section 85.61. Accordingly, we conclude the legislature has not clearly vested the agency with interpretive authority for the definition of "employee." Therefore, we review the question of statutory interpretation of 85.61(11) for errors at law.

"The court's goal when construing a statute is to determine legislative intent." *Sierra Club Iowa Chapter v. Iowa Dep't of Transp.*, 832 N.W.2d 636, 644 (Iowa 2013). The court will look no further if the statute's language is plain and unambiguous. *Id.*

The Iowa Workers' Compensation Act provides a " '[w]orker' or 'employee' [is] a person who has entered into the employment of, or works under contract of service, express or implied, or apprenticeship, for an employer." *See* Iowa Code § 85.61(11) (2013). The legislature also included in the definition of worker or employee certain people who do not meet this broad definition. *See id.* § 85.61(11)(*a*). Then, the legislature excluded certain people who otherwise meet the broad

definition of a worker or employee contained in section 85.61(11). *See id.* § 85.61(11)(*c*).

Section 85.61(11) demonstrates that the legislature enacted a comprehensive legislative scheme to determine if a person is a worker or employee under the Iowa Workers' Compensation Act. This legislative scheme makes it clear a person who meets the broad definition under section 85.61(11) is a worker or employee covered by the Iowa Workers' Compensation Act. This broad definition unambiguously includes undocumented workers. In its list of persons excluded from the definition, the legislature did not exclude undocumented workers.

Under the rule of *expressio unius est exlusio alterius*, meaning that "legislative intent is expressed by omission as well as by inclusion, and the express mention of one thing implies the exclusion of others not so mentioned," the legislature did not intend to exclude undocumented workers from the broad definition in section 85.61(11). *See Meinders v. Dunkerton Cmty. Sch. Dist.*, 645 N.W.2d 632, 637 (Iowa 2002) (quoting *Marcus v. Young,* 538 N.W.2d 285, 289 (Iowa 1995)) (applying the rule). If the legislature intended the definition of a worker or employee to exclude undocumented workers, it would have done so by adding undocumented workers to the excluded list in section 85.61(11)(*c*). It is not our role to add to the list of excluded workers or employees. That is a policy decision the legislature must make. Therefore, we find the commissioner and the district court did not err in determining an undocumented worker met the broad definition of "employee" under the Iowa Workers' Compensation Act.

**B. Whether the Iowa Workers' Compensation Act Does Not Apply Because a Contract of Service Between an Undocumented Worker and Her Employer is Void.** The issue here is whether a

contract between an undocumented worker and an employer is void. If so, the undocumented worker cannot qualify for benefits under the Iowa Workers' Compensation Act for lack of a contract of service. Section 85.61 of the Iowa Workers' Compensation Act states a person meets the definition of "employee" if the person works under an express or implied contract of service. Iowa Code § 85.61(11). Although the language of the statute states an "employee" is "a person who has entered into the employment of, or works under contract of service . . . for an employer," we have interpreted this provision to require a contract of service. *See Knudson v. Jackson,* 191 Iowa 947, 949–50, 183 N.W. 391, 393 (1921) ("In order for a person to come within the terms of this act as an employee, therefore, it is essential that there be a 'contract of service, express or implied,' with the employer whom it is sought to charge with liability.").

The general rule is an agreement that is contrary to the provisions of any statute or intends to be repugnant to general common law policy is void. *Reynolds v. Nichols & Co.,* 12 Iowa 398, 403 (1861). Staff Management argues an employment contract between an undocumented worker and an employer is contrary to the provisions of the Immigration Reform and Control Act of 1986 (IRCA), or in the alternative, the employment contract has an illegal purpose.

The IRCA makes it unlawful for employers to hire undocumented workers, or to knowingly continue to employ workers who become unauthorized. 8 U.S.C. § 1324a(a)(1)–(2) (2013). The employment contract at issue here is a contract between an employer and an undocumented worker. "[W]hen a statute imposes sanctions but does not specifically declare a contract to be invalid, it is necessary to ascertain whether the legislature intended to make unenforceable

contracts entered into in violation of the statute." *Gates v. Rivers Constr. Co.*, 515 P.2d 1020, 1021 (Alaska 1973). The IRCA does not specifically state that a contract between an employer and an undocumented worker is void. *See* 8 U.S.C. § 1324a(a). Therefore, we must consider whether Congress intended to make such contracts void.

The Connecticut Supreme Court addressed this issue in *Dowling v. Slotnik*, 712 A.2d 396, 408–09 (Conn. 1998). The employers argued (1) the employment agreement between the employers and the undocumented worker was illegal, (2) the illegal contract was void, and therefore, (3) there could not be a contract of service under the Connecticut Workers' Compensation Act. *Id.* at 409.

The court recognized it was not the intention of Congress to preempt labor protections under existing law when it passed the IRCA. *Id.* at 404. In the House Report on the IRCA it was specifically stated " 'it is not the intention of the Committee that the employer sanctions provisions of the bill be used to undermine or diminish in any way labor protections in existing law.' " *Id.* (quoting H.R. Rep. No. 99-682, pt. 1, at 58 (1986)). The goal of the IRCA was to inhibit employment of undocumented workers and to punish the employers who offered jobs to these workers. *Id.* at 410–11.

The court reasoned that if undocumented workers were not covered by the Connecticut Workers' Compensation Act, employers would have a financial incentive to hire undocumented workers because the employers could avoid liability under the Act. *Id.* at 411. The court concluded classifying agreements between undocumented workers and employers as "contracts of service" met both the intent of the legislature concerning the Connecticut Workers' Compensation Act and would meet the public policy Congress intended in the IRCA. *Id.*

We agree with this reasoning. The purpose of the IRCA was to inhibit employment of undocumented workers. It was not to diminish labor protections for undocumented workers. The purpose of the Iowa Workers' Compensation Act is to make statutory compensation available to employees when the employees sustain injuries as a result of the hazards of the business. *Crooke v. Farmers' Mut. Hail Ins. Ass'n*, 206 Iowa 104, 108, 218 N.W. 513, 514 (1928). Construing an employment agreement between an undocumented worker and an employer as not covered by the Iowa Workers' Compensation Act would undermine the IRCA by encouraging employers to hire undocumented workers because the employers would not be liable under the Iowa Workers' Compensation Act for any injuries those workers sustained. It would also undermine the purpose of the Iowa Workers' Compensation Act to make statutory compensation available to employees when the employees sustain injuries as a result of the hazards of the business. Therefore, we agree with the Connecticut Supreme Court it was not Congress's intent in enacting the IRCA for these contracts to be unenforceable because they are void as a violation of statute.

Staff Management also raises a question of whether the employment contract had an illegal purpose. As recognized by a New York court, an employment contract with an undocumented worker does not involve an illegal purpose because

> [a]n undocumented alien performing construction work is not an outlaw engaged in illegal activity, such as bookmaking or burglary. Rather, the work itself is lawful and legitimate; it simply happens to be work for which the alien is ineligible or disqualified.

*Majlinger v. Cassino Contracting Corp.,* 25 A.D.3d 14, 29 (N.Y. App. Div. 2005) (internal citations omitted). The Kansas Supreme Court also

considered this question and surveyed other jurisdictions on the issue of whether contracts of employment with undocumented workers are illegal and therefore unenforceable. *See Coma Corp. v. Kansas Dep't of Labor*, 154 P.3d 1080, 1089–91 (Kan. 2007). Although the case before the court did not require the court to decide whether undocumented workers were entitled to workers' compensation benefits, the court determined generally the employment contract with an undocumented worker was not illegal under the public policy of the state. *Id.* at 1092. The court based its decision on cases from Alaska, New York, Maryland, Connecticut, New Jersey, and Colorado. *Id.* at 1089–91.

At least one court has recognized a difference between a taint of illegality and an illegal purpose. The Connecticut Supreme Court rejected the argument that a contract between an employer and an undocumented worker was so illegal as to interfere with the grant of worker's compensation benefits. *See Dowling*, 712 A.2d at 409. The court recognized the general rule not to enforce illegal contracts only applied to contracts with the purpose of violating the law. *See id.* (stating the court would not lend assistance to carry out terms of a contract with the inherent purpose to violate the law).

The Connecticut Supreme Court drew a comparison between child labor laws and the IRCA. In a previous case before the court, the court recognized the taint of illegality in a child labor contract did not arise from a contractual provision requiring the employee to engage in unlawful activity, but instead arose from a child labor statute prohibiting the making of certain employment agreements. *Id.* at 410. The court determined construing employment agreements with illegally employed minors as "contracts of service" would further the public policy underlying the child labor law rather than impede it. *Id.* The court

noted that regardless of the legal situation of the employment of the minor, the minor was in fact an employee. *Id.* Similarly, the court determined the employment agreement between an undocumented worker and an employer constituted a contract of service to qualify the undocumented worker for protection under Connecticut's Workers' Compensation Act. *Id.* at 409.

We find the analysis used by these courts in deciding this issue persuasive. The enforcement of the contract does not undermine the policy purposes of the IRCA. Moreover, an employment contract with an undocumented worker does not inherently have an illegal purpose, and it is not void as illegal merely because the contract is with an undocumented worker. Therefore, we find the commissioner and the district court did not err in finding the employment contract is a contract of service under the Iowa Workers' Compensation Act.

**C. Whether Federal Law Preempts the Availability of Healing Period Benefits Under the Iowa Workers' Compensation Act.** Even if the Iowa Workers' Compensation Act does not exclude an undocumented worker, we must decide if federal law preempts healing period benefits. This is a constitutional issue, and therefore our review is de novo. *Iowa State Commerce Comm'n*, 465 N.W.2d at 281.

Under the Supremacy Clause, the laws of the United States are the supreme law of the land. U.S. Const., art. VI, cl. 2. "Congress has the power to preempt state law." *Arizona v. United States*, ___ U.S. ___, ___, 132 S. Ct. 2492, 2500, 183 L. Ed. 2d 351, 368 (2012). There are at least three scenarios where federal law will preempt state law: (1) Congress may enact a statute with an express preemption provision, (2) Congress may occupy the field with a regulatory framework " 'so pervasive . . . that Congress left no room for the States to supplement it,' " or (3) the state

law is an obstacle for Congress's objectives and purposes. *Id.* at ___, 132 S. Ct. at 2500–01, 183 L. Ed. 2d at 368–69 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 1152, 91 L. Ed. 1447, 1459 (1947)).

Although the power to regulate immigration is unquestionably an exclusive federal power, the Supreme Court "has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power, whether latent or exercised." *De Canas v. Bica*, 424 U.S. 351, 354–55, 96 S. Ct. 933, 936, 47 L. Ed. 2d 43, 48 (1976) (*superseded by statute on other grounds*, Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, 100 Stat. 3359, *as recognized by Chamber of Commerce of U.S. v. Whiting*, ___ U.S. ___, ___, 131 S. Ct. 1968, 1975, 179 L. Ed. 2d 1031, 1045 (2011)).

We agree with the analysis by the Connecticut Supreme Court as to whether the IRCA either expressly or impliedly preempted the award of workers' compensation benefits to an undocumented worker. *See Dowling*, 712 A.2d at 402–05. There, the court recognized the express preemption provision in the IRCA only prohibited civil sanctions, the Connecticut legislature did not intend workers' compensation benefits to be civil sanctions, and therefore the IRCA did not preempt the payment of benefits. *Id.* at 403–05. In Iowa, healing period benefits are not a civil sanction against the employer. *See* Iowa Code § 85.34(1). Rather, the legislature designed healing period benefits to provide compensation for a work-related injury. *See id.* Therefore, the IRCA does not expressly preempt healing period benefits.

Furthermore, we do not find the IRCA impliedly preempts the award of healing period benefits. The Connecticut court recognized the

legislative intent of the IRCA was not to undermine labor protections, and workers' compensation benefits were not an incentive for future immigration law violations so that the payment of benefits to undocumented workers would undermine the IRCA. *Dowling*, 712 A.2d at 404–05. We agree.

Finally, Staff Management relies on the opinions in *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 151, 122 S. Ct. 1275, 1284, 152 L. Ed. 2d 271, 283–84 (2002) and *Tarango v. State Industrial Insurance System*, 25 P.3d 175, 178–79 (Nev. 2001), to support its preemption argument. In *Hoffman Plastic Compounds*, the Supreme Court determined awarding back pay to undocumented workers would violate the explicit statutory provisions in the IRCA by condoning prior violations of immigration laws and encouraging future violations of immigration laws. 535 U.S. at 151, 122 S. Ct. at 1284, 152 L. Ed. 2d at 283–84. In *Tarango*, the Nevada Supreme Court held an undocumented worker should not receive vocational rehabilitation benefits. 25 P.3d at 179–80. The Nevada court determined the purpose of vocational rehabilitation benefits is to return an injured worker to the workforce, and a decision to deny vocational training benefits would be in harmony with the IRCA. *Id.* at 180.

These cases are distinguishable from the present case. Under our statute, healing period benefits are disability payments to compensate a worker for the injuries he or she suffered due to a work-related injury. *See* Iowa Code § 85.34(1). Although the commissioner uses the amount of a worker's earnings to determine the amount of a benefit, the benefit is payable due to a disability caused by a work-related injury that prevents an employee from returning to work. *See id.* §§ 85.34(1), 85.37(1).

Healing period benefits are not back pay or vocational rehabilitation benefits. Back pay " 'is a reparation order designed to vindicate the public policy of the statute by making the employees whole for losses suffered on account of an unfair labor practice.' " *NLRB v. J.H. Rutter-Rex Mfg.,* 396 U.S. 258, 263, 90 S. Ct. 417, 420, 24 L. Ed. 2d 405, 410 (1969) (quoting *Nathanson v. NLRB*, 344 U.S. 25, 27, 73 S. Ct. 80, 82, 97 L. Ed 23, 28 (1952)). Under our statutory scheme, vocational rehabilitation benefits are separate and distinct from healing period benefits. *Compare* Iowa Code § 85.34(1), *with id.* § 85.70. The vocational rehabilitation program is under section 85.70, and provides a weekly payment for each week the employee is participating in a vocational rehabilitation program. Iowa Code § 85.70. In contrast, the purpose of healing period benefits is to replace lost wages, while the employee receives medical and hospitalization care, and to meet the broad purpose of workers' compensation to award compensation for the disability produced by a physical injury. *See Bell Bros. Heating & Air Conditioning v. Gwinn,* 779 N.W.2d 193, 200 (Iowa 2010). Therefore, the IRCA does not preempt healing period benefits under the Iowa Workers' Compensation Act.

**V. Whether Substantial Evidence Supports the Commissioner's Running Award of Healing Period Benefits.**

The commissioner awarded Jimenez a running award of healing period benefits from the date of the injury, September 13, 2007. Healing period benefits are payable

> beginning on the first day of disability after the injury, and until the employee has returned to work or it is medically indicated that significant improvement from the injury is not anticipated or until the employee is medically capable of returning to employment substantially similar to the

employment in which the employee was engaged at the time of injury, whichever occurs first.

Iowa Code § 85.34(1). The deputy found Jimenez was entitled to a running award of healing period benefits because there was no credible evidence she was at MMI or could perform substantially similar tasks after her injury as she had prior to her injury. The commissioner and the district court affirmed this finding.

We review a district court decision reviewing agency action to determine if we would reach the same result as the district court in our application of the Iowa Administrative Procedure Act. *City of Des Moines v. Emp't Appeal Bd.*, 722 N.W.2d 183, 189 (Iowa 2006). If the agency's decision is erroneous under a ground specified in the Iowa Administrative Procedure Act and a party's substantial rights have been prejudiced, the district court may reverse or modify an agency's decision. Iowa Code § 17A.19(10). If a determination of fact by the commissioner "is not supported by substantial evidence in the record before the court when that record is viewed as a whole," we may grant relief from the commissioner's decision. *Id.* § 17A.19(10)(*f*). The Code defines substantial evidence as

> the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance.

*Id.* § 17A.19(10)(*f*)(1). If the evidence is open to a fair difference of opinion, substantial evidence supports the commissioner's decision. *See ABC Disposal Sys., Inc. v. Dep't of Natural Res.*, 681 N.W.2d 596, 603 (Iowa 2004). A court "should not consider evidence insubstantial merely because the court may draw different conclusions from the record." *Arndt v. City of Le Claire*, 728 N.W.2d 389, 393 (Iowa 2007).

In determining whether substantial evidence exists to support an agency's findings, we must consider the credibility determination by the presiding officer who had a chance to observe the demeanor of the witnesses. *Christiansen v. Iowa Bd. of Educ. Exam'rs*, 831 N.W.2d 179, 192 (Iowa 2013). When analyzing the deputy's credibility determination, we look at the facts relied upon by the expert and circumstances contained in the record. *Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 845 (Iowa 2011).

In her ruling, the deputy found Dr. Epp's opinions more credible. Dr. Epp opined Jimenez's present condition was related to the original injury of September 13, 2007, as a sequela of the 2007 hernia repairs. She also opined Jimenez has not reached MMI with regard to the September 13 injury. In our review of the record, we agree with the district court's ruling that substantial evidence supports these opinions and the commissioner's findings.

According to the record, immediately after the surgery Jimenez was experiencing pain near the incision site. Jimenez returned to Dr. Peterson who examined her. Dr. Peterson noticed tenderness to the right side of the scar. He suggested non-surgical intervention, but opined that he may need to remove the mesh used to repair the hernia and try a tissue-based repair. The surgeon referred her to Dr. Maves, who performed an exam and gave her two injections to relieve the pain. Dr. Maves's notes indicate on physical examination, he felt a knot in the muscular area that was tender to palpitation. At the hearing, Jimenez and the lay witnesses confirmed Jimenez had debilitating pain since the original surgery and an area around the original surgery site was growing from a knot into a large bulge. In commenting on the lay witnesses' credibility, the deputy stated:

> The witnesses appeared credible. They did not fidget. Their answers were straightforward. There were no material contradictions on cross examination. Claimant did not flinch in answering the hard questions put to her, such as whether she had ever filed a tax return (no) and whether she could legally work in the US (no, again). Even [Staff Management]'s own representative, Susan Liest, testified that she believed claimant to be truthful with Ms. Liest during claimant's employment with Staff Management.

Dr. Epp relied on this history, the prior medical examinations, and her medical examination in forming her opinions in this matter. It was in the commissioner's province to accept Dr. Epp's testimony and award Jimenez running healing period benefits. Therefore, there is substantial evidence on the record to support the commissioner's decision.

Staff Management also argues it offered Jimenez work, but she was unable to work because she was undocumented. The district court rejected this argument as not supported by the evidence and so do we.

Under section 85.33(3),

> [i]f an employee is temporarily, partially disabled and the employer for whom the employee was working at the time of injury offers to the employee suitable work consistent with the employee's disability the employee shall accept the suitable work . . . . If the employee refuses to accept the suitable work with the same employer, the employee shall not be compensated with temporary partial, temporary total, or healing period benefits during the period of the refusal.

Iowa Code § 85.33(3).

Substantial evidence supports that Jimenez was unable to do her prior job due to her work-related injury. When Jimenez returned to work, she needed her coworkers to help her perform her prior job. We have previously recognized that an employer must take into account an employee's work restrictions when providing suitable work. *See Schutjer v. Algona Manor Care Ctr.*, 780 N.W.2d 549, 559 (Iowa 2010). It is disingenuous for Staff Management to argue that they offered her a job

that she was unable to perform, which in turn would disqualify her from healing period benefits.

Therefore, we find substantial evidence supports the commissioner's finding that Jimenez is entitled to a running award of healing period benefits from the date of the original injury.[1]

**VI.** **Whether the Commissioner May Award Healing Period Benefits Starting From a Date Preceding the Parties' Stipulation as to When the Benefits Should Start.**

The administrative rules promulgated by the commissioner require the following:

> Counsel and pro se litigants shall prepare a hearing report that defines the claims, defenses, and issues that are to be submitted to the deputy commissioner who presides at the hearing. The hearing report shall be signed by all counsel of record and pro se litigants and submitted to the deputy when the hearing commences.

Iowa Admin. Code r. 876—4.19(3)*(f)* (2011). In conformance with this rule, the parties filed a hearing report stating an issue in this case was "[c]laimant is seeking either temporary total, temporary partial disability, or healing period benefits from 1/1/09 through current and running." At the beginning of the hearing, the deputy reviewed the hearing report with the attorneys. Staff Management's position was Jimenez's present condition was not work related, and she fully recovered from the September 13, 2007 injury when she was authorized to return to work in December 2007.

---

[1]This opinion is limited to a worker's right, whether the worker is documented or undocumented, to a running award of healing period benefits under the facts of this case. We take no position as to whether an undocumented worker is entitled any other benefits under the Iowa Workers' Compensation Act.

In his opening statement, Jimenez's attorney stated his position was Jimenez was not able to work going back as far as January 1, 2009. Staff Management's attorney then gave his opening statement. During his opening statement, he reiterated his position that he agreed a work-related injury occurred on September 13, 2007, but any problems from the original injury were resolved in December 2007 when her doctor authorized her to return to work.

During his opening statement, Staff Management's attorney also indicated that the doctors scheduled Jimenez for surgery on her present condition sometime in the future. At this point, the deputy interrupted counsel's opening statement and the following colloquy took place:

> THE DEPUTY COMMISSIONER: Well, is this issue right for hearing? I mean, if the claimant is going to be having surgery for an issue that is allegedly related to the 9-13-2007 injury that arose out of the course and scope of her employment, do we know what her MMI date is? Are you going to ask for a running total?

> MR. McANDREW: Yeah. We're asking for a running of TTD. That's the only issue we were not able to work out before hearing, Your Honor.

> MR. SPENCER: That's one of the disputed pieces in this case is to whether or not there's enough healing period awarded or whether permanency should be awarded.

> THE DEPUTY COMMISSIONER: You may have to come back, then, and determine PPD depending on the facts as they play out.

> We'll go ahead and proceed on the issue of the TTD and whether there is permanency or whether permanency can be assessed at this time.

We must decide the effect of the statement in the hearing report regarding the start date of benefits. If the stipulation contained in the hearing report is binding, we must consider if the parties, due to their

colloquy with the deputy and the evidence introduced at the hearing, abandoned the stipulation in the hearing report.

The date that healing period benefits begins is a factual issue. Thus, the stipulation contained in the hearing report that the disability began January 1, 2009 is a stipulation of fact. We attempt to determine and give effect to the parties' intentions when construing the parties' stipulation of fact. *See Graen's Mens Wear, Inc. v. Stille-Pierce Agency,* 329 N.W.2d 295, 300 (Iowa 1983). The stipulation in the hearing report, without more, is binding on the start date of either temporary total, temporary partial disability, or healing benefits.

Jimenez relies on a recent case where we refused to follow a stipulation where the parties stipulated the commencement date of permanent partial disability. *Mycogen Seeds v. Sands*, 686 N.W.2d 457, 467 (Iowa 2004). Jimenez's reliance on *Mycogen Seeds* is misplaced. The conversion date from a healing period is a mixed question of law and fact. *See* Iowa Code § 85.34(2) (stating permanent partial disability begins at the termination of healing period). The *Mycogen Seeds* case stands for the proposition that it is the commissioner's duty to determine the application of law to the contested facts, and this determination is not within the parties' power by stipulation. *See Mycogen Seeds*, 686 N.W.2d at 467; *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Gailey*, 790 N.W.2d 801, 804 (Iowa 2010) (holding the court has the obligation to determine the application of law to facts after determining the facts).

However, we cannot consider the hearing report in a vacuum. *See Graen's Mens Wear, Inc.*, 329 N.W.2d at 300. We must consider the stipulation "with reference to its subject matter and in light of the surrounding circumstances and the whole record, including the state of the pleadings and issues involved." *Id.* Accordingly, we consider the

colloquy between the deputy and the attorneys, the manner in which the parties conducted the trial, and the understanding of the deputy as to the issues.

During Staff Management's opening statement, the deputy noticed an inconsistency in the hearing report. The inconsistency was that the hearing report stated permanent partial disability payments were in dispute when Jimenez had not had a second surgery for the alleged injury. The deputy then asked the parties if the real issue in the case was if the present injury was caused by the work-related injury of September 13, 2007, there was no way to determine when she reached MMI; thus, the issue was whether Jimenez was entitled to a running award from September 13. Jimenez's attorney agreed this was an issue. Staff Management's attorney also agreed this was an issue. The deputy confirmed she would try this issue in the administrative hearing.

The manner the parties conducted the trial is consistent with the deputy's understanding that an issue before her was whether Jimenez was entitled to a running award from September 13, 2007. After completion of opening statements, Jimenez's attorney offered exhibits one through fifteen in the record. Staff Management's counsel objected to two of the exhibits as untimely, but did not object to exhibit nine. Exhibit nine contains Dr. Epp's records. In those records, Dr. Epp opined Jimenez has not reached MMI with regard to the September 13 injury.

Staff Management offered Exhibit N into evidence. Exhibit N shows the payments made by Staff Management to Jimenez right after her surgery. The exhibit covered the period from November 14, 2007 to December 25, 2007, the time Jimenez was off work for her injuries. According to the hearing report, an issue existed as to credit for benefits

paid. If the only issue was for benefits paid after January 1, 2009, what relevance do these payments have regarding a credit?

The lay testimony also detailed all the physical problems Jimenez experienced since her initial surgery in November 2007. Much of the testimony was that Jimenez never recovered and was unable to work. Staff Management made no objections to the relevance of this testimony. This testimony was consistent with the issue of a running award.

Finally, we believe the deputy understood the parties agreed one of the issues was whether Jimenez was entitled to a running award beginning September 13, 2007. In her arbitration decision, she set forth the items stipulated to and those in dispute. She appears to copy those items from the hearing report. All the stipulated and disputed items she mentioned in the arbitration decision are consistent with the hearing report except the stipulation regarding the January 1, 2009 start date for benefits. Instead, the deputy stated in her decision the issue before her was "whether claimant was unemployed due to her work injury from September 13, 2007, to the present, and therefore entitled to a running award." The deputy's action in only changing the stipulation regarding the start date for benefits shows it was her understanding this issue had changed since the hearing report.

These circumstances lead us to conclude the parties amended the hearing report stipulation regarding the January 1, 2009, start date for benefits during their colloquy with the deputy. The evidence admitted at the hearing is consistent with an amendment to the hearing report. The deputy's written decision confirms the parties amended the hearing report.

Moreover, the amendment did not affect Staff Management's case. Staff Management did not have any evidence regarding the start date of

benefits. Staff Management's sole defense was the work-related injury of September 13, 2007 did not cause Jimenez's present condition. Consequently, the amendment to which it agreed did not change its burden of proof or prejudice its case.

Therefore, the issue of a running award of healing period benefits from September 13, 2007, was properly before the commissioner.

**VII.  Whether the Commissioner May Award Healing Period Benefits During a Time Period when Jimenez was Working.**

The day after the injury, September 14, 2007, Jimenez saw Dr. Cuddihy. He diagnosed her hernias. He gave her an abdominal bandage and returned her to sedentary work. She worked until her surgery on November 14, 2007. She returned to work on December 26, 2007, until January 22, 2008. The running award given by the commissioner began on September 13, 2007. Healing period benefits are not payable when an employee returns to work. Iowa Code § 85.34(1). However, an employee may receive temporary partial disability benefits if he or she returns to work and receives a reduction in wages from what he or she earned prior to the injury. *Mannes v. Fleetguard, Inc.*, 770 N.W.2d 826, 830 (Iowa 2009).

Jimenez does not claim nor does the record support that she was receiving less than her full wage when she worked before and after her surgery. Accordingly, the commissioner should have excluded the dates Jimenez was working from the running award. Therefore, the district court erred in affirming this part of the award of healing period benefits.

**VIII.  Disposition.**

We affirm the district court judgment in all respects, except for the part of the district court judgment affirming the running award of healing period benefits when Jimenez returned to work before and after her

surgery. Accordingly, we affirm in part, reverse in part the district court judgment, and remand the case to the district court to remand the case back to the commissioner to enter an order consistent with this decision on the issue of the running award of healing period benefits when Jimenez returned to work before and after her surgery.

We assess costs on appeal to Staff Management and New Hampshire Insurance Company.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.**

All justices concur except Mansfield and Waterman, JJ., who specially concur.

**MANSFIELD, Justice (concurring specially).**

I join in my colleagues' well-reasoned opinion but write separately to emphasize one point. I agree that under Iowa law, an employee's undocumented status does not deprive her of workers' compensation benefits where she suffers a job-related injury. At the same time, however, under Iowa law, an employee's undocumented status does not entitle her to *enhanced* benefits.

In this case, the employer argues that it terminated Pascuala Jimenez's employment on January 22, 2008, because it received confirmation from United States Immigration and Customs Enforcement she could not legally work in the United States. This was approximately four months after Jimenez suffered her workplace injury. Jimenez concedes she cannot lawfully work in this country at the present time.

In *Schutjer v. Algona Manor Care Center*, we held that when an employee has been offered suitable work and then quits, the act of quitting amounts to a refusal of suitable work, thereby ending the employee's right to temporary partial benefits, temporary total benefits, or healing period benefits. 780 N.W.2d 549, 559 (Iowa 2010). Analogizing this case to *Schutjer*, the employer here argues that Jimenez's loss of her job due to her inability to maintain lawful immigration status is equivalent to a refusal to accept suitable work. Hence, according to the employer, Jimenez should be foreclosed from receiving temporary or healing period benefits.

There are two problems with this argument on the present record. First, although Jimenez was initially offered light-duty work on December 4, 2007, she was subsequently called back to her regular job, which she attempted to perform until she was let go on January 22, 2008. It is

unclear whether the employer would have offered Jimenez light-duty work at a later date if she had been able to resolve her immigration status. Second, while there was certainly evidence to support the employer's explanation for ending Jimenez's employment on January 22, the commissioner did not make a finding on the ground for Jimenez's termination. For these two reasons, I do not think the present record allows an appellate court to conclude that Jimenez refused an offer of suitable work within the meaning of Iowa Code section 85.33(3). We don't know whether Staff Management fired her because of her immigration status, and we don't know whether Staff Management would have offered her suitable work but for her immigration status.

Having said that, I believe that when an employer offers suitable work to an injured employee conditioned on the employee's obtaining lawful status to work in this country, and the employee is unable to take the position because she does not have the proper paperwork, this amounts to a refusal of suitable work. *See* Iowa Code § 85.33(3) (2013). Thus, on a proper record, not present here, I would sustain the employer's argument.

Other jurisdictions appear to be in agreement with this view. *See Del Taco v. Workers' Comp. Appeals Bd.*, 94 Cal. Rptr. 2d 825, 828–29 (Cal. Ct. App. 2000) (finding a vocational rehabilitation award would be inappropriate when the claimant could not be employed because of his undocumented status and noting such an award would cause the worker to be more protected than a documented worker, who under the same circumstances would be required to return to work for employer under modified duty); *Martines v. Worley & Sons Constr.*, 628 S.E.2d 113, 116 (Ga. Ct. App. 2006) (finding a worker unjustifiably refused to accept suitable work when the worker's illegal immigration status "caused his

inability to accept the proffered employment" because he could not legally obtain a driver's license); *Gayton v. Gage Carolina Metals, Inc.*, 560 S.E.2d 870, 874 (N.C. Ct. App. 2002) ("[I]t is the employer's burden to produce sufficient evidence that there are suitable jobs plaintiff is capable of getting, 'but for' his illegal alien status."); *Reinforced Earth Co. v. Workers' Comp. Appeal Bd.*, 749 A.2d 1036, 1040 (Pa. Commw. Ct. 2000) (holding that the employer, in order to suspend or modify benefits, must establish the undocumented claimant's ability to perform other work but need not show actual job availability "as it would be illegal for him to work").

Waterman, J., joins this special concurrence.