**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES SMALL BUSINESS ADMINISTRATION, an agency of the government of the United States of America, *Plaintiff-Appellee*, | No. 14-17404 D.C. No. 3:13-cv-02263-WHO |
| v. | OPINION |
| MICHAEL D. BENSAL, an individual, *Defendant-Appellant*, | |
| and | |
| SUSAN J. BENSAL, as trustee of the Edward D. Bensal Trust; MICHAEL EDWARD BENSAL, an individual; SOPHIA BENSAL, an individual, *Defendants*. | |

Appeal from the United States District Court
for the Northern District of California
William Horsley Orrick, District Judge, Presiding

Argued and Submitted December 12, 2016
San Francisco, California

Filed April 4, 2017

Before:  Michael Daly Hawkins, Marsha S. Berzon,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Murguia

## SUMMARY[*]

### Federal Debt Collection Procedures Act

The panel affirmed the district court's judgment in favor of the United States Small Business Administration ("SBA") in the SBA's action seeking to satisfy a default judgment assigned to SBA, arising after the default on a loan that SBA guaranteed between a private bank and appellant Michael Bensal's company.

Michael Bensal did not accept an inheritance in his deceased father's trust, and instead signed a disclaimer, which transferred his trust share to his children and prevented creditors from accessing his trust share under California law.

The Federal Debt Collection Procedures Act ("FDCPA")'s "fraudulent transfer" provision allows the federal government to void a fraudulent transfer by a debtor owing a debt to the United States.  The SBA sought to void Bensal's disclaimer under the FDCPA as a fraudulent transfer

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

that prevented SBA from collecting the debt Bensal owed on the default judgment.

The panel held that the FDCPA displaced California's disclaimer law, California Probate Code § 283. The panel concluded that Bensal's disclaimer constituted a transfer of property under the FDCPA, and California disclaimer law did not operate to prevent the SBA from reaching Bensal's trust share.

The panel held that Bensal owed a "debt" to the United States. The panel concluded that the portion of the default judgment based on a second loan, which was guaranteed by the SBA, was a "debt" within the meaning of the FDCPA.

---

**COUNSEL**

Brian D. Seibel (argued), Seibel & Finta LLP, Concord, California, for Defendant-Appellant.

David M. Wiseblood (argued), San Francisco, California, for Plaintiff-Appellee.

---

**OPINION**

MURGUIA, Circuit Judge:

This case requires us to interpret two provisions of the Federal Debt Collection Procedures Act ("FDCPA"), which Congress enacted "to create a comprehensive statutory framework for the collection of debts owed to the United States government." *United States v. Gianelli*, 543 F.3d 1178, 1183 (9th Cir. 2008) (quoting H.R. Rep. No. 101-736, at 32 (1990)).

The United States Small Business Administration ("SBA") guaranteed a loan between a private bank and Appellant Michael Bensal's ("Bensal") company, Bensal & Coburn Investments LLC ("BCI"). After BCI defaulted on the loan, the private bank sued BCI as the borrower and Bensal as a personal guarantor. The private bank recovered a default judgment and assigned that judgment to the SBA.

Several years later, Bensal inherited a share in his deceased father's trust. Bensal did not accept his inheritance; instead, he signed a disclaimer, which legally passed his trust share to his two children and prevented creditors from accessing his trust share under California law. After Bensal executed his disclaimer, the SBA filed a lawsuit seeking to satisfy its default judgment. The district court held that: (1) the SBA is allowed to recover from Bensal's trust share under the FDCPA despite contrary California law, and (2) the default judgment was a debt within the meaning of the FDCPA. We affirm.

## BACKGROUND

In 1999, BCI sought to establish TransWorld Burgers, a fast-food restaurant with an airline-inspired theme and decor. To finance this operation, BCI took out two loans from Millennium Bank ("Millennium"). In connection with the second loan, but not the first, BCI sought a guaranty from the SBA.

The SBA is a federal government agency that assists small businesses by, among other things, guaranteeing commercial loans from private banks. By providing its guaranty that a commercial loan will be repaid, the SBA eliminates some of the risk private lenders face and encourages private lenders to extend more loans to small businesses. 15 U.S.C. § 636(a) ("The [SBA] is empowered . . . to make loans to any qualified small business . . . either directly or in cooperation with banks or other financial institutions through agreements to participate on an immediate or deferred (guaranteed) basis."); *see also United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 719 n.3 (1979) (noting that "[t]he SBA prefers to guarantee private loans rather than to disburse funds directly").

### A. The SBA Guaranty and BCI's Default

Over the course of several months, the parties signed several documents as part of the SBA's guaranty of the second loan between BCI and Millennium. First, Millennium submitted an application to the SBA for an SBA guaranty of 75% of a proposed $250,000 loan to BCI. In a signed document ("SBA Authorization"), the SBA reduced the loan amount to $175,000, but otherwise approved the bank's application, agreeing to guarantee up to 75% of the loan.

Next, BCI and Millennium executed a standard loan contract ("Business Loan Agreement"), in which BCI borrowed $175,000 from Millennium. BCI signed a form ("SBA Note") acknowledging its second loan with Millennium, and Bensal signed a form ("SBA Guaranty") personally guaranteeing repayment of the second loan if BCI defaulted. Both the SBA Note and the SBA Guaranty appeared on SBA letterhead, referenced the same SBA loan-identifying information, and defined rights SBA held against Bensal and BCI.

In January 2000, BCI defaulted on its payment obligations under both loans; some time before the default, Millennium had assigned both loans to First Bank & Trust ("FBT"). FBT filed suit in California state court and alleged, among other claims, that BCI had breached the SBA Note and Bensal had breached the SBA Guaranty. The state court entered default judgment against BCI and Bensal in the following sums: (1) $95,576.66 in principal and interest owed on the first loan, (2) $140,905.63 in principal and interest owed on the second loan, (3) $50,257.92 in attorney fees, and (4) $902.50 in costs.

Because neither BCI nor Bensal satisfied the default judgment, FBT requested that the SBA honor its guaranty of the second loan. In 2005, the SBA negotiated a monetary adjustment with FBT and ultimately paid $54,027.39 to satisfy its obligations as a guarantor on the second loan. In 2011, FBT assigned to the SBA its right to collect the entire amount owing on the default judgment (over $300,000) from BCI and Bensal.

### B. Bensal's Inheritance and Disclaimer

In July 2011, Bensal's father died, leaving behind the Edward D. Bensal Trust ("EDB Trust"), which consisted of cash and securities valued at $400,692.94. The trust document awarded Bensal 40% of the EDB Trust. In October 2011, Bensal executed a "Disclaimer of Interest in Trust," which means he renounced—refused to accept—his 40% share of the trust. The legal effect of the disclaimer under California law was that Bensal's trust share passed to his two children. CAL. PROB. CODE § 282.

After Bensal executed the disclaimer, the SBA filed suit in federal district court against the EDB Trust, Bensal, and Bensal's two children. The SBA sought to void Bensal's disclaimer under the FDCPA. In its complaint, the SBA claimed that Bensal had fraudulently transferred his trust share to his children by executing the disclaimer, thereby preventing the SBA from collecting the debt Bensal owed on the default judgment.

Bensal advanced two arguments in response. First, he asserted that his disclaimer was not a fraudulent transfer because the California Probate Code provides that "[a] disclaimer is not a voidable transfer." CAL. PROB. CODE § 283. Second, he maintained that the default judgment assigned to the SBA was not a "debt" within the meaning of the FDCPA.

The district court rejected both of Bensal's arguments, granted summary judgment in favor of the SBA, and ordered the defendants to "transfer all property representing Bensal's trust share to the SBA in satisfaction of the portion of the default judgment relating to the second loan." At the time of

the district court's summary judgment order, the amount Bensal owed on the portion of the default judgment relating to the second loan was over $300,000,[1] while the value of Bensal's trust share totaled $153,944.03. Bensal timely appealed.

## STANDARD OF REVIEW

This case involves only statutory interpretation, which we review de novo. *See Millard v. United Student Aid Funds, Inc.*, 66 F.3d 252, 253 (9th Cir. 1995). We review a district court's grant of summary judgment de novo. *Entrepreneur Media v. Smith*, 279 F.3d 1135, 1139–40 (9th Cir. 2002).

## DISCUSSION

At the heart of this case lies the FDCPA's "fraudulent transfer" provision, which allows the federal government to void a fraudulent transfer by a debtor owing a debt to the United States.[2] 28 U.S.C. §§ 3301–3308. Specifically, the FDCPA provides that

> a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States which arises before the transfer is made or the obligation is incurred if—

---

[1] In the default judgment issued in 2002, the state court determined that BCI and Bensal owed $140,905.63 on the second loan. Since that time, interest has accrued at a rate of 10% annually, bringing the total amount owed on the second loan to over $300,000.

[2] The SBA falls within the definition of the "United States" under the FDCPA. 28 U.S.C. § 3002(15).

(1)(A) the debtor makes the transfer or incurs the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and

(B) the debtor is insolvent at that time or the debtor becomes insolvent as a result of the transfer or obligation[.]

28 U.S.C. § 3304(a).

Based on the statutory language, the SBA must prove: (1) the existence of a debt predating the transfer, (2) a transfer of assets, (3) lack of equivalent value in exchange for the transfer, and (4) the debtor's insolvency at the time of transfer. Neither party contests that the third and fourth requirements are satisfied. Instead, the dispute centers on: (1) whether Bensal's disclaimer qualifies as a transfer of property, and (2) whether the default judgment constitutes a debt.

## I. Whether Bensal's Disclaimer is a Transfer of Property

Bensal contends that California law, which expressly states that "[a] disclaimer is not a voidable transfer," controls over the FDCPA and prevents the SBA from reaching the EDB Trust assets. CAL. PROB. CODE § 283. We disagree and hold that the FDCPA displaces California's disclaimer law.

### A. Preemption

"The Supremacy Clause of the Constitution provides that any state law conflicting with federal law is preempted by the

federal law and is without effect." *Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1203 (9th Cir. 2002) (citing U.S. Const. art. VI, cl. 2). Where a statute contains an express preemption clause, we "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 594 (2011) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)) (internal quotation marks omitted).

The FDCPA contains an express preemption clause, which "preempt[s] State law to the extent such law is inconsistent with a provision of [the statute]." 28 U.S.C § 3003(d). Echoing this preemption clause, federal regulations provide:

> No person, corporation, or organization that applies for and receives any benefit or assistance from SBA, or that offers any assurance or security upon which SBA relies for the granting of such benefit or assistance, *is entitled to claim or assert any local or state law to defeat the obligation* incurred in obtaining or assuring such Federal benefit or assistance.

13 C.F.R. § 101.106(d) (emphasis added). When Bensal signed the SBA Guaranty, in which he personally guaranteed the second loan, he agreed to a provision that tracks the language of the regulation: "As to this Guarantee, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claim of SBA, or preempt federal law."

The state law at issue here is California Probate Code § 283, which provides that "[a] disclaimer is not a voidable transfer." This law directly conflicts with the FDCPA, which defines "transfer" in such a way as to include Bensal's disclaimer. The FDCPA defines "transfer" as "every mode . . . of *disposing of* or parting with an *asset* or an interest in an *asset*. . . ." 28 U.S.C. § 3301(6) (emphasis added). "'Asset' means *property* of a debtor. . . ." *Id.* § 3301(2) (emphasis added). The term "property" is defined as

> *any present or future interest*, whether legal or equitable, in real, personal (including choses in action), or mixed property, tangible or intangible, vested or contingent, wherever located and however held (including community property and *property held in trust* . . . .

*Id.* § 3002(12) (emphasis added). Based on the plain language of the FDCPA, Bensal's disclaimer of the trust property qualifies as a transfer of property because Bensal "disposed of" a "present or future interest" in his 40% share of "property held in trust" by executing a disclaimer that channelled the trust share to his children.

Under the FDCPA, Bensal's disclaimer is a transfer of property that can be voided, 28 U.S.C. § 3304(a), but under the California Probate Code "[a] disclaimer is not a voidable transfer." CAL. PROB. CODE § 283. It seems quite clear that California law is inconsistent with the FDCPA and must give way to the federal statute in light of the express preemption clause.

**B.  Supreme Court Precedent**

Even aside from the preemption clause, our conclusion that the FDCPA controls over California disclaimer law also finds support in the Supreme Court's decision in *Drye v. United States*, 528 U.S. 49 (1999). Bensal argues that *Drye* is inapplicable to the facts of this case and urges us instead to apply the holding of *In re Costas*, 555 F.3d 790 (9th Cir. 2009). Because both *Drye* and *Costas* addressed state disclaimer laws that are virtually identical to the California law at issue here, these two cases are best discussed in tandem.

In *Drye*, the debtor, who owed a substantial tax debt to the federal government, inherited his mother's estate. 528 U.S. at 52. Soon after being named sole heir, the debtor disclaimed his interest in the estate, which then passed by operation of Arkansas state law to his daughter. *Id.* Upon learning of the debtor's inheritance, the Internal Revenue Service ("IRS") filed a notice of federal tax lien, but the debtor argued that Arkansas inheritance law disallowed creditors from reaching disclaimed property. *Id.* at 53. The Supreme Court rejected this argument and explained,

> The question whether a state-law right constitutes "property" or "rights to property" is a matter of federal law. We look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-

> delineated rights qualify as "property" or
> "rights to property" within the compass of the
> federal . . . legislation.

*Id.* at 58 (internal citation and quotation marks omitted). The Court then looked to state law and noted that Arkansas gave the debtor a choice: he could either "receive the entire value of his mother's estate," or choose to "channel that value to his daughter." *Id.* at 61. Based on this choice, the Court concluded that the debtor held a "control rein" over his inheritance and, therefore, possessed "property" within the meaning of the federal tax lien statute. *Id.* at 61. Ultimately, the *Drye* court concluded that state law did not bar the IRS from recovering against the debtor's trust share. *Id.*

In *Costas*, we addressed a nearly identical state disclaimer statute in the context of bankruptcy law and arrived at a different result. The debtor in *Costas* received a share in her father's trust upon his death in 2002; shortly thereafter, she executed a disclaimer under Arizona law to relinquish her interest, which passed the trust share to her children. 555 F.3d at 791–92. A few weeks later, the debtor filed for bankruptcy, and the Chapter 7 bankruptcy trustee sought to void the disclaimer under the bankruptcy code's fraudulent transfer provision. *Id.* at 792. The debtor argued that under Arizona law, creditors were prohibited from reaching disclaimed property; in response, the trustee invoked *Drye* for the proposition that Arizona disclaimer law does not control over federal law. *Id.* at 792–93. We distinguished *Drye* both factually and legally. *Id.* at 795–97.

First, we noted a factual distinction based on the timing of the disclaimer in the two cases. The debtor in *Drye* executed his disclaimer *after* the government already had a

pre-existing interest in his property; therefore, "[a]pplication of the state law . . . would have stripped the government of [its] interest." *Id.* at 796. In contrast, the debtor in *Costas* executed her disclaimer *before* filing for bankruptcy, meaning that the bankruptcy estate did not have any prior interest in the disclaimed property and "the state law did not operate to defeat any pre-existing interests." *Id.* We explained that *Drye* is more analogous to post-petition disclaimers (i.e., where the debtor executes a disclaimer *after* filing for bankruptcy) because in those situations "courts have generally included disclaimed property in the estate, reasoning that the right to disclaim itself belongs to the estate as of the time of filing." *Id.* In short, we concluded that when a debtor executes a disclaimer *after* a debt has already been accrued, then a state disclaimer law does not control.

Next, we noted differences in the purpose and structure of the federal tax lien statute and the bankruptcy code. As to purpose, we explained that the federal tax lien statute is primarily concerned with collection of federal debts, which "justifies the extraordinary priority accorded" to the federal government and "contrasts sharply with the policy of bankruptcy law, which largely respects substantive state law rights." *Id.* at 796–97. We also highlighted a structural dissimilarity between the two statutes, explaining that the federal tax lien statute recognizes "only a narrow range of [property] exemptions, none of which mention[] disclaimers," whereas the bankruptcy code's property "exemptions are . . . quite broad, allowing a debtor to take advantage of all available state law exemptions." *Id.* at 797 (citing 11 U.S.C. § 522).

Ultimately, we "refuse[d] to extend [*Drye*'s] logic to the bankruptcy context" in the *Costas* decision. *Id.* Unlike

*Costas*, however, this case presents a situation that factually and legally fits within the *Drye* framework.

First, the IRS in *Drye* and the SBA here both had a pre-existing interest in the disclaimed property because the debtor in each case executed a disclaimer *after* the debt had already accrued. *Id.* at 796. In contrast, the trustee in *Costas* had no prior interest in the debtor's disclaimed property, because the disclaimer there occurred *before* the debtor filed for bankruptcy. *Id*. This factual distinction is crucial, as we recognized in *Costas*, because "[a]pplication of the state law [disclaimer] would . . . strip[] the government of [its pre-existing] interest." *Id.*

Next, the purpose of the FDCPA is more similar to the federal tax lien statute at issue in *Drye* than the bankruptcy code involved in *Costas*. Much like the federal tax lien statute, the FDCPA is primarily concerned with the collection of federal debt, as it was enacted to "create a comprehensive statutory framework for the collection of debts owed to the United States government." *Gianelli*, 543 F.3d at 1183 (quoting H.R. Rep. No. 101-736, at 32 (1990)). This purpose is also reflected in the legislative history of the FDCPA, which reveals that Congress' goal was to

> bring an end to the present situation whereby a crazy patchwork of laws in the 50 states dictate the debt collection remedies available to [the federal government] in collecting Federal debts. It would provide consistent and fair creditors' rights to the Government regardless of the state of residence of the debtor and eliminate the preferences certain

> state laws presently confer on Federal debtors
> who just happen to live in states which are
> regarded as notorious 'debtors havens.'

H.R. Rep. No. 101-825 (1990).

The FDCPA does share the bankruptcy code's extensive list of property exemptions. *See* 28 U.S.C. § 3014(a)(1) (expressly incorporating the bankruptcy code's property exemptions into the FDCPA). This single, shared feature between the FDCPA and the bankruptcy code, however, is dwarfed by the significant parallels between the FDCPA and the federal tax lien statute. More importantly, we acknowledged in *Costas* that despite the bankruptcy code's extensive property exemptions, if the facts there had been more similar to the facts here (i.e., a disclaimer after the bankruptcy estate "gain[ed an] interest in the right to disclaim") the state disclaimer law *would not* have prevented creditors from accessing the disclaimed property. *In re Costas*, 555 F.3d at 796. The considerable similarity between the federal tax lien statute and the FDCPA supports extending the reasoning in *Drye* to the present case. *See Exp. Imp. Bank of U.S. v. Asia Pulp & Paper Co.*, 609 F.3d 111, 117 (2d Cir. 2010) (extending the *Drye* analysis from the federal tax lien statute to the FDCPA context).

Applying the analytical framework set forth in *Drye*, we look "to state law to determine what rights the [debtor] has in the property the Government seeks to reach, then to federal law to determine whether the [debtor's] state-delineated rights qualify as 'property' or 'rights to property' within the compass of the [FDCPA]." 528 U.S. at 58. To determine what rights Bensal possessed in his 40% share of the EDB Trust, we must turn to the California disclaimer law at issue here,

which is virtually indistinguishable from the Arkansas disclaimer law addressed in *Drye*. Both statutes allow a beneficiary to channel inherited property to his children and expressly prohibit creditors from reaching disclaimed property. *Compare* CAL. PROB. CODE § 282–83 *with Drye*, 528 U.S. at 53. In light of the nearly identical disclaimer statutes, the Supreme Court's holding in *Drye* mandates a single outcome here: "[Bensal] had the unqualified right to receive the . . . value of his [father's] estate . . . or to channel that value to his [children]. The control rein he held under state law . . . rendered the inheritance 'property' or 'rights to property' belonging to him within the meaning of [the FDCPA]." *Drye*, 528 U.S. at 61.

Therefore, we conclude that Bensal's disclaimer constitutes a transfer of property under the FDCPA, and California disclaimer law does not operate to prevent the SBA from reaching Bensal's trust share.

## II. Whether Bensal Owes a "Debt" to the United States

The second disputed issue is whether the state court default judgment assigned to the SBA constitutes a "debt" within the meaning of the FDCPA. The FDCPA defines a "debt" as follows:

> (A) an amount that is owing to the United States on account of a direct loan, or loan insured or guaranteed, by the United States; or

> (B) an amount that is owing to the United States on account of a fee, duty, lease, rent, service, sale of real or personal property, overpayment, fine, assessment, penalty,

restitution, damages, interest, tax, bail bond
forfeiture, reimbursement, recovery of a cost
incurred by the United States, or other source
of indebtedness to the United States, but that
is not owing under the terms of a contract
originally entered into by only persons other
than the United States.

28 U.S.C. § 3002(3). Because the statute is written in the
disjunctive, an amount owed constitutes a "debt" as long as
it satisfies either subsection (A) or subsection (B). We hold
that the default judgment assigned to the SBA is a debt under
subsection (B), and therefore we need not address subsection
(A).

Subsection (B) contains a broad definition of "debt" that
encompasses a wide array of financial obligations as well as
a catch-all provision for any "other source of indebtedness to
the United States." *Id.* § 3002(3)(B). The expansive definition
of "debt" set forth in subsection (B) is, however, cabined by
limiting language that excludes any amount "owing under the
terms of a contract originally entered into by only persons
other than the United States." *Id.*

Neither party disputes that a default judgment falls within
the catch-all provision because it qualifies as an "other source
of indebtedness to the United States." *Id.* The only question
before us, then, is whether the limiting language prevents the
default judgment from qualifying as a debt under subsection
(B); that is, whether the default judgment involves a debt
"owing under the terms of a contract originally entered into
by only persons other than the United States."

The Fifth Circuit has issued an instructive opinion interpreting the limiting language of subsection (B). *Sobranes Recovery Pool I, LLC v. Todd & Hughes Const. Corp.*, 509 F.3d 216 (5th Cir. 2007). In *Sobranes*, the Federal Deposit Insurance Corporation ("FDIC"), a United States agency, acquired the assets of a failing private bank in receivership. *Id.* at 218. Among those assets was a loan originally entered into between the defunct bank and a private borrower, who had defaulted. *Id*. Shortly after acquiring the bank's assets, the FDIC brought suit against the defaulting borrower and secured a judgment. *Id*. At issue before the Fifth Circuit was whether the FDIC's judgment constituted a "debt" under subsection (B). *Id.* at 223. The Fifth Circuit explained,

> The subpart (B) limitation is directly applicable to this case: the note underlying the FDIC's judgment was originally entered into by only private parties. Thus, even though a judgment obtained by the government can fall within the scope of subpart (B), the final clause prevents the judgment here from being an FDCPA debt. . . . *The judgment does not create an obligation between the debtor and holder that is independent of the note. That is, the note establishes the rights and liabilities of the parties, what is owed and to whom. . . .* The subpart (B) limitation captures this relationship and applies it where the United States was not a party to the underlying contract.

*Id.* at 223–24 (emphasis added). The court looked beyond mere labels to the actual source of the debt in the default

judgment and determined whether the United States was originally a party to the underlying contracts.

We find this to be a sensible approach that comports with the statutory language and purpose of the FDCPA. For instance, the FDCPA provides procedures allowing the government "to recover a judgment *on a debt*," which indicates that the focus should be on the source of the debt. 28 U.S.C. § 3001(a)(1) (emphasis added). Moreover, the House report accompanying the FDCPA states, "'Debt' is defined broadly to include amounts owing to the United States on account of a direct loan or loan insured or guaranteed by the United State [*sic*] as well as other amounts *originally due* the United States." H.R. Rep. No. 101-736 (emphasis added). Additionally, during legislative discussion preceding the enactment of the FDCPA, one representative explained that "[t]he definition of 'debt' was carefully written to make clear that the act will not apply to obligations which begin as purely private loan or contract obligations." 136 Cong. Rec. H13288-02, H13288 (1990) (statement of Rep. Brooks). Overall, the language, purpose, and legislative history of the FDCPA suggest that the statute was intended to reach debt arising from transactions in which the federal government was originally a party.

Applying the *Sobranes* approach, we look to the contracts underlying the default judgment to determine whether the SBA was originally a party. The default judgment here stems from FBT's lawsuit against BCI and Bensal, alleging breach of the SBA Note and the SBA Guaranty. Both of these documents were inextricably part of a larger, four-party transaction between the SBA, Millennium, BCI, and Bensal. In fact, the sole reason BCI and Bensal were required to sign the SBA Note and SBA Guaranty, respectively, was to secure

the SBA's guarantee of the second loan. Moreover, both the SBA Note and the SBA Guaranty appeared on SBA letterhead, referenced the same loan-identifying information, and defined rights held by the SBA against Bensal and BCI. Finally, the form and substance of the SBA Note and SBA Guaranty derive from the overarching SBA Authorization, in which the SBA set forth its terms for the overall transaction. Based on the underlying contracts, then, it appears the SBA was a party to the original transaction.

Our conclusion that the SBA was a party also finds support in the statutory authority delegated to the SBA by Congress. When guaranteeing a loan, the SBA can "authorize participating lending institutions to take actions relating to loan servicing *on behalf of the [SBA]*, including . . . loan monitoring, *collection*, and liquidation." 15 U.S.C. § 634(b)(7) (emphasis added). Even though the SBA can authorize others to service a loan, the SBA remains a party to the loan and retains the power to take over the loan servicing, liquidation, collection, or related litigation activities. *See id.*; 13 C.F.R. § 120.535(d). The SBA also has statutory authority to "pursue to final collection, by way of compromise or otherwise, *all claims against third parties assigned to* the [SBA] in connection with loans made by [it]." *See* 15 U.S.C. § 634(b)(4) (emphasis added).

Bensal advances several arguments in support of his position that the default judgment was not a debt under the FDCPA. First, Bensal points out that the FDCPA defines "judgment" as "a judgment, order, or decree *entered in favor of the United States* in a court and arising from a civil or criminal proceeding regarding a debt." 28 U.S.C. § 3002(8) (emphasis added). Seizing on this language, Bensal argues that the default judgment at issue here falls outside the

purview of the FDCPA because it was not "entered in favor of the United States"; rather, it was entered in favor of FBT, a private lender. But § 3002(3)(B), which allows the federal government to recover any "other source of indebtedness to the United States," does not use the term "judgment," and so is not limited to the statutory definition of that term.

Next, Bensal contends that his financial obligation on the second note was merely a "guaranty" not a "loan," and therefore it cannot constitute a "debt" under the FDCPA. However, Bensal fails to provide any legal support for the proposition that a "guarantor," as opposed to a "direct borrower," somehow falls outside the purview of the FDCPA. As explained above, the SBA is authorized to "pursue to final collection . . . *all claims against third parties assigned to* the [SBA] in connection with loans made by [it]." *See id.* § 634(b)(4) (emphasis added). The claim against Bensal is a claim against a third party in connection with a loan guaranteed by the SBA, and therefore falls within the SBA's statutory authority.

In fact, Bensal's proposed rule—that a "guaranty" does not qualify as a "debt" under the FDCPA—would lead to disastrous practical consequences. The SBA requires personal guarantees from individuals who own at least 20% of or hold significant management positions in any business seeking a direct loan or guarantee. 13 C.F.R. § 120.160 (a) ("Holders of at least a 20 percent ownership interest generally must guarantee the loan."); *see also Collateral*, SMALL BUSINESS ADMINISTRATION (last visited Jan. 20, 2017), https://www.sba.gov/loans-grants/get-ready-apply/check-your-credit/collateral ("For all SBA loans, personal guaranties are required from every owner of 20 percent or more of the business, as well as from other individuals who

hold key management positions.").**[3]** These personal guarantees provide an additional level of financial security, allowing the SBA to extend and guarantee more loans to small businesses. Bensal's argument would eliminate the SBA's ability to recover from personal guarantors, which would undermine the financial viability of the small business loan program. This argument is legally unsupported and practically untenable.

Bensal also contends that the SBA would be receiving a windfall if allowed to recover the entire amount owed on the default judgment when the SBA only paid a fraction of that sum ($54,027.39) to satisfy its guaranty obligations. This argument fails because, as explained above, the SBA is authorized to pursue or delegate collection of guaranteed loans. 15 U.S.C. § 634(b)(7). An entirely separate provision addresses the SBA's rights after it has paid an amount to satisfy its guaranty obligations: "In the event the [SBA] pays a claim under a guarantee . . . , it shall be subrogated fully to the rights satisfied by such payment." 15 U.S.C. § 634(g)(5)(A). By including these two separate provisions, Congress intended to grant two separate authorizations, one allowing the SBA to collect on a loan that it has guaranteed and another allowing the SBA to recover an amount that it has paid as a guarantor. Thus, the mere fact that the SBA did not pay the full amount it now seeks to recover does not somehow bar this action.

Finally, Bensal argues that the SBA improperly seeks to enforce the entire default judgment, even though only a

---

**[3]** "It is appropriate to take judicial notice of this information, as it was made publicly available by government entities." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

portion of the judgment concerned the SBA's guarantee of the second loan. This argument is unpersuasive based purely on the numbers here. As of January 31, 2013, the total value of Bensal's share in the EDB Trust was at least $153,944.30. The amount Bensal owes as a guarantor on the second loan is over $300,000 ($140,905.63 plus 10% interest accruing from December 12, 2002). Therefore, it does not matter that the default judgment also encompasses the first loan because the amount owed to the SBA on the second loan by itself exceeds the value of Bensal's share in the EDB Trust.[4]

## CONCLUSION

In sum, we hold that the SBA is allowed to reach Bensal's trust share because the FDCPA displaces California's disclaimer law. We also conclude that the portion of the default judgment based on the second loan, which was guaranteed by the SBA, is a debt within the meaning of the FDCPA.

**AFFIRMED**.

---

[4] Bensal also argues that claim preclusion and issue preclusion bar the present action  because the SBA's claim is based on the second loan, which is now merged in the state-court judgment and barred from re-litigation. This argument fails because the SBA is not attempting under a federal statute to re-litigate any issues previously adjudicated in the state court action; rather, the SBA filed suit to void a fraudulent transfer—an issue not implicated in the state court litigation.